**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GOODYEAR AEROSPACE CORPORA- TION, Respondent.**

**No. 73–2020.**

United States Court of Appeals, Sixth Circuit.

Argued April 5, 1974.

Decided June 4, 1974.

Allen H. Feldman, N. L. R. B., for petitioner; Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Joseph E. Mayer, Allen H. Feldman, Attys., N. L. R. B., Washington, D. C., on brief.

Edward C. Kaminski, Akron, Ohio, for respondent; Philip S. Heffernan, Goodyear Aerospace Corp., Akron, Ohio, on brief.

Before PECK and LIVELY, Circuit Judges; and WALINSKI *, District Judge.

LIVELY, Circuit Judge.

The National Labor Relations Board seeks enforcement of its order in which it adopted the recommended order of the administrative law judge who conducted a hearing on unfair labor practice charges brought against Goodyear Aerospace Corporation (Goodyear). The decision and order of the Board are reported at 204 NLRB #119. For a number of years prior to January 1972, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (Union) had been the bargaining representative of employees of Goodyear at its Akron, Ohio facility. The overall unit at Goodyear contained approximately 1,800 employees, about 365 of whom were employees of the Vinyl Division. At the

* The Honorable Nicholas J. Walinski, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

time that the controversy arose there was in effect a vinyl agreement, affecting only employees of the Vinyl Division, which altered the terms of the basic agreement between Goodyear and the Union. The basic agreement would expire on August 10, 1973 and the vinyl agreement had been extended to March 1, 1973.

Between January 28 and March 29, 1972 a series of meetings was held between Goodyear and Union representatives at the request of Goodyear. The stated purpose of the meetings was to discuss problems of the Vinyl Division, and the Union agreed only to listen and insisted that the meetings not be considered negotiations. The thrust of Goodyear's position was that, despite an increase in sales it remained in a poor competitive position in the vinyl industry with a profit margin of approximately one percent of sales. The Union spokesmen asked for dollar figures to substantiate this claim and when this request was denied, they demanded that the books of the Company be opened to Union auditors. This demand was repeated and refused at each of the meetings. The Company presented a written proposal suggesting ten changes in the vinyl agreement including agreement to forego a wage increase scheduled for all Goodyear employees in August 1972. Most of the proposals were rejected immediately by the Union, but it did indicate the possibility of consideration of several of the proposals at a later date.

At a meeting with the Union on March 29 the Company announced that a series of meetings would be held with employees of the Vinyl Division, including salaried and supervisory personnel as well as Union members. It was stated that small groups of about 15 employees would be called together, that Mr. Leary would make a presentation on behalf of the Company setting forth its problems and that a request would be made for employee cooperation and for suggestions of methods to improve the situation. The Union representatives were furnished with copies of a 15-page statement which had been prepared by the Company and was to be read by Mr. Leary to each meeting of employee groups. They were also furnished with several graphs and charts which showed the sales of the Vinyl Division in dollars and the profits of the Division in percentage of sales. The Union again asked for disclosure of the Company books to the Union audit department with the statement that if the books showed the Company was not making enough money the Union would take this back to the people and that the Company would not have to do so. This request was again refused, and the Union then presented the Company with a letter declaring that any attempt to discuss problems with members rather than the duly elected Union representatives would be considered a violation of the contract and an unfair labor practice.

During the next two days, approximately 30 meetings were held with employees of the Vinyl Division and 170 to 180 of the 365 employees attended. Mr. Leary followed the same format at each meeting, referring to an article which had appeared in the Company newspaper and then reading the prepared statement with references to the charts and graphs. He emphasized the lack of competitiveness of the Vinyl Division in the industry and listed the contract changes which had been proposed to the Union. Mr. Leary stated that the Union felt it could not do anything about these proposals before the contract expiration and then asserted that if it became necessary to wait 18 months for changes there would be nothing to talk about. He did not disclose that the Union had demanded the right to audit the Company's books to determine the facts about its profits and that the Company had refused. Before closing each meeting the Company spokesman announced the establishment of a "Vinyl Hotline" by which suggestions and questions from employees would be given prompt consideration with a direct response to each such communication. The meetings were followed by a letter to each em-

ployee, which again referred to the problems of the Vinyl Division, listed the proposed contract changes and requested suggestions and questions.

In response to Goodyear's contention that Section 8(d) of the Act relieved it of any obligation to furnish financial data in view of the insistence by the Union that none of the meetings involved negotiations, the administrative law judge wrote:

> One of the primary purposes of Section 8(d) of the Act was to create a peaceful industrial relations climate through stable collective bargaining agreements. When the Respondent sought agreement from the Union to its proposed changes, the Union was free to flatly reject the proposals or to sit down and discuss them. It opted for the latter approach. Since there was no obligation on the part of the Union to *negotiate* proposed changes, the Respondent was under no obligation to furnish the supporting data to support its claim. But when the Respondent took its case to the employees and sought to undermine the Union, the scene was no longer a discussion of operational problems facing the Company which the parties were discussing. The scene shifted from the discussion table to a conflict created by the Employer's appeals to the employees, described above. Such tactics on the part of the Respondent tended to disrupt the stability of the collective bargaining agreement, as contemplated by Section 8(d). By engulfing the employees into the dispute with the Union, the Respondent here was engaging in tactics tending to impair the ability of the Union to function as the bargaining representative and creating a climate whereby the Union would be compelled to negotiate, if not to agree, to changes in the current contract. On the basis of the above considerations, I find and conclude that Respondent, by failing to furnish the information sought by the Union to verify Respondent's claim, violated Section 8(a)(5) and (1) of the Act.

In affirming the administrative law judge and adopting his order and notice the Board held that the two aspects of the Company's conduct were intertwined and together constituted a violation of Sections 8(a)(5) and (1) of the Act. On appeal, Goodyear denies that the two acts with which it is charged should be considered together and insists that its refusal to give financial information should not be treated as an unfair labor practice, because of its subsequent dealings with the employees. Rather, it contends the two issues should be considered separately and that it should be held not to have been guilty of an unfair labor practice in either respect. In brief and argument, Goodyear has presented three issues to the court: (1) Whether its refusal to open the Company books for a Union audit was a refusal to bargain within the meaning of N. L. R. B. v. Truitt Manufacturing Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956); (2) Whether employee meetings and talks by Company representative Leary were protected activities under Section 8(c) or a violation of Section 8(a)(5); and (3) Whether the affirmative provisions of the order are punitive in nature.

With respect to the first issue, Goodyear maintains that there was never a specific request to prove that profits were only one percent of sales, but only a broad demand that the Company open its books. The finding of the administrative law judge that the Union did request specific dollar amounts of the profits is supported by substantial evidence. The record also reveals that the Union did not stop with its specific demand for dollar figures, but did request that the books of the Company be turned over to its auditors for verification of the claim of a one percent profit ratio. In N. L. R. B. v. Truitt Manufacturing Co., *supra,* the Supreme Court held that an employer did not bargain in good faith when it claimed that it could not afford to pay higher wages but

refused a request of the union to produce information substantiating its claim. The board held that the company had violated Section 8(a)(5) and failed to bargain in good faith with respect to wages and it was ordered to supply the union with such information as would substantiate its position of economic inability to grant the requested wage increase. In upholding enforcement of the order, the Supreme Court, speaking through Mr. Justice Black, stated: "Good-faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy." 351 U.S. at 152–153. The Court cautioned that it was not holding that in every case where the economic ability of an employer became an issue that the employees were automatically entitled to substantiating information. Goodyear argues that in the present case it never claimed inability to pay the wages of the other employees of the Company, but merely asserted that the Vinyl Division would remain non-competitive in the industry unless it received relief from wage and fringe benefit costs. Nevertheless, we note that one of the proposals for contract changes which Goodyear made at its meetings with the Union was that the employees of the Vinyl Division forego a scheduled wage increase. This and other proposals were presented in the context of a meeting where the Company had made the statement that there was no incentive to keep the Vinyl Division in production unless its profit picture could be improved, and that unless relief could be obtained sooner than 18 months there would be no point in discussing the issues. We find that the claims of non-competitiveness in this particular case are the equivalent of the claims of inability to pay the wages demanded in *Truitt*.

Goodyear insists that the requested audit of its books was not relevant to the claim of non-competitiveness since the charts and graphs which it furnished the Union disclosed the facts concerning profits of the Vinyl Division and that the question of competitiveness is one of opinion which would not be further answered by an audit. In General Electric Company v. N. L. R. B., 466 F.2d 1177 (6th Cir. 1972), we held that it is an unfair labor practice within the meaning of Section 8(a)(5) for an employer to fail to furnish requested data which is relevant to a union's role as bargaining agent. We stated, "Good faith bargaining requires full disclosure by the parties of relevant information in order to produce informed, effective negotiations." 466 F.2d at 1183. In N. L. R. B. v. Rockwell-Standard Corporation, Trans. & Axle Div., Forge Div., 410 F. 2d 953 (6th Cir. 1969), we held that information regarding wages of employees in a bargaining unit is presumptively relevant to bargaining issues and that any employer has a duty to provide such information on request.

■ Neither the Union nor the Company was required to negotiate at the time of their meetings. If they entered into negotiations, however, the fact that they were mid-term in existing contracts would not have relieved Goodyear of the duty to provide information needed by the Union in carrying out its duties as bargaining representative. Kroger Co. v. N. L. R. B., 399 F.2d 455 (6th Cir. 1968); N. L. R. B. v. Acme Industrial Co., 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed. 2d 495 (1967). However, the Union served notice at the first meeting that it would only listen and was not involved in negotiations. After Goodyear had presented its proposal for contract changes the Union demanded a written agreement extending the existing vinyl agreement one year and its Regional Director took the position that the Company's proposals "had been wiped clean off the table upon the signing of this extension of the vinyl agreement."

■ While Goodyear did not furnish dollar figures with respect to profits, on the other hand, the Union did not repeat this request, but substituted a demand that the Company's books be opened to the Union auditors. The letter from the Union president which was delivered to the Company representative at the conclusion of the March 29 meeting conditioned Union consideration of Vinyl Division problems solely on the Company's compliance with the demand for a Union audit. We do not believe that the responses of either party to the requests of the other reflect the give and take of good faith bargaining. Both were sparring, but neither was willing to commit itself to genuine negotiations. Since neither was required to negotiate, Goodyear was not compelled to supply information at a time when the Union was only willing to listen. Under the facts of this case, Goodyear's refusal to furnish financial data was not an unfair labor practice. N. L. R. B. v. Truitt Manufacturing Co., *supra*, at 153.

■ We agree with the Board that Goodyear violated Sections 8(a)(1) and (5) of the Act by appealing directly to its employees for a "partnership solution" to its problems after its discussions with the Union failed to produce negotiations. The employees had not repudiated the Union as their bargaining representative and the Act forbids interference with the right of the employees to bargain collectively through their chosen representatives. The activities of Goodyear in this case, in going directly to the employees in an attempt to achieve contract changes shortly after signing a written extension of the agreement with the Union was an unfair labor act. It tended to undermine the position of the Union and was "subversive of the mode of collective bargaining . . . ordained" by the Act. Medo Photo Supply Corporation v. N. L. R. B., 321 U.S. 678, 684, 64 S.Ct. 830, 833, 88 L.Ed. 1007 (1944). The action of Goodyear went beyond the free expression of "views, argument, or opinion" guaranteed by Section 8(c) of the Act. The employees were told at the series of meetings that unless changes were made before the Union had indicated it was willing to consider them "there will be no need for talking." The implication was clear that there was a danger that the Vinyl Division would close and jobs would be lost unless the Company could find a solution to its problems in partnership with the employees rather than working through the Union.

■ We do not believe that the record supports the Board's conclusion that the separate acts of the Company were so intertwined as to render its refusal to supply financial information on the Union's terms an unfair labor practice. Rather, we agree with the conclusions reached by Chairman Miller in his separate opinion.

Enforcement of the Order of the National Labor Relations Board of February 16, 1973 is granted in part and denied in part. The case is remanded to the Board for entry of an order directing Goodyear to cease and desist from attempting to bargain directly with the employees to the detriment of the Union, or in any like or related manner interfering with, restraining, or coercing its employees in the exercise of their rights guaranteed in Section 7 of the Act, and providing for posting an appropriate notice.

So ordered.