BUFFALO BITUMINOUS, INC.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

International Union of Operating
Engineers, Local No. 49,
Intervenor-Respondent.

No. 77–1001.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 14, 1977.

Decided Nov. 4, 1977.

David R. Hols, Felhaber, Larson, Fenlon & Vaogt, St. Paul, Minn., made argument, filed appearance and appendix and brief, and made rebuttal, for petitioner.

Arnold Podgorsky, Atty., N.L.R.B., Washington, D.C. (argued), and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C. (on brief), for respondent; John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Tay-

lor, Associate Gen. Counsel, and N.L.R.B., Washington, D.C., on brief.

Bruce A. Finzen, Robins, Davis & Lyons, St. Paul, Minn., argued and filed appearance for intervenor-respondent.

Before VAN OOSTERHOUT, Senior Circuit Judge, STEPHENSON, Circuit Judge, and MARKEY,* Chief Judge.

STEPHENSON, Circuit Judge.

This case is before us on the petition of Buffalo Bituminous, Inc. (Buffalo) to review and on the cross-application of the National Labor Relations Board (Board) to enforce an order of the Board issued December 7, 1976, against Buffalo.[1] The Board in affirming the findings and conclusions of the administrative law judge, found that Buffalo had violated 29 U.S.C. § 158(a)(1) and (5) by failing and refusing to execute a written contract incorporating an agreement reached with Local Union No. 49, International Union of Operating Engineers AFL–CIO (Union) on August 13, 1975, and by bypassing the Union and negotiating directly with Buffalo's employees.[2] Our review of the record as a whole convinces us there is substantial evidence to support the Board's findings and no error of law appears.[3]

The record reveals that Buffalo, a bituminous paving contractor, and the Union had collective bargaining relations for several years prior to 1975. During that time the parties followed a practice whereby the Union would initially negotiate an agreement with an employer association, the Associated General Contractors of Minnesota. Following this initial agreement, Buffalo, a nonmember of the employer association, would execute a document wherein it agreed to abide by the terms of the initial agreement.

In May 1975 Darrell Hicks, president of Buffalo, told Union business representative Donald Egan that he was dissatisfied with the employer association contract. Hicks expressed his desire to have the Union negotiate a separate agreement with a blacktoppers association. The Union tentatively agreed to this arrangement.

In June 1975 the blacktoppers association decided to wait for the outcome of the employer association and Union negotiations. Following the blacktoppers' decision, Hicks sent a letter to the Union stating in part "that since our company is not a member of any contractor association bargaining with your organization, that this constitutes formal notice to you that we will be bargaining on our own behalf." In response to this letter, Union business representative Egan went to the Buffalo premises to speak with Hicks. Hicks asked Egan to arrange a meeting for him with the heads of the Union and two other unions—the Teamsters and Laborers. Subsequently a luncheon meeting was arranged for August 13, 1975. In the interim, on July 17, the Union and the employer association completed negotiations for a new contract.

The meeting was held as scheduled on August 13, 1975. Buffalo was represented by Hicks, Junior Kreps and Curtis Duininck. The Union was represented by Egan and Frank Pendzimas. Chris Van Lith and Glen Esterly represented the Teamsters. All of the witnesses before the administrative law judge generally agreed that Hicks began the discussion at the meeting by stating that he would agree with the terms of the Union-employer association contract ne-

---

* The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. The Board's decision and order are reported at 227 N.L.R.B. No. 20.

2. The administrative law judge found that the general counsel "has not established that the

Respondent made threats of economic reprisals violative of Section 8(a)(1) of the Act."

3. Member Peter D. Walther, in his dissent, found that the administrative law judge's findings and credibility resolutions were implausible. Accordingly, Member Walther found no violation of 29 U.S.C. § 158(a)(1) and (5).

gotiated on July 17 with one exception. Hicks wanted a special wage rate to apply in a rural area where Buffalo competed with nonunion contractors. Frank Pendzimas replied for the Union that a special wage rate was not possible. Pendzimas explained that the Union could not deviate from the Union-employer association contract because that agreement contained a most favored nation clause. This clause provided that any concessions made to any other employer would have to be made to the employer association contractors.

Egan testified that at this point in the meeting, following considerable discussion as to the reasons why the Union could not deviate from the terms of the employer association contract, lunch was served. The group then divided into smaller groups around the table and Egan and Hicks engaged in a separate conversation. According to Egan, he reiterated to Hicks that the Union would not give him a special wage rate in the rural area. Hicks then told Egan that he would sign the agreement and that beginning the next week Egan "should stop in and * * * get it done." The meeting terminated shortly thereafter.

On August 19 Egan went to Hicks' office and presented him with a document for signing wherein Buffalo would agree to abide by the terms of the employer association agreement. Hicks refused to sign the document. Egan again asked Hicks to sign the agreement on August 22 and Hicks refused.

In direct contradiction, Hicks testified that he did not make any commitment to Egan during the meeting on August 13. Moreover, Hicks denied having any separate conversation with Egan during the meeting. Junior Kreps and Curtis Duininck, both representatives of Buffalo, corroborated Hicks' testimony by testifying that they did not recall a separate conversation between Hicks and Egan.

The administrative law judge, in finding that Egan appeared as a more frank, forth-right and truthful witness than Hicks, credited Egan's version of the meeting and found that Hicks agreed to accept the terms of the employer association contract on August 13. Additionally, the administrative law judge found that Hicks' refusal to sign a written document incorporating the terms of the negotiated contract constituted a violation of 29 U.S.C. § 158(a)(5) and (1). *See NLRB v. Strong*, 393 U.S. 357, 361, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969); *H. J. Heinz Co. v. NLRB*, 311 U.S. 514, 526, 61 S.Ct. 320, 85 L.Ed. 309 (1941); *NLRB v. Ralph Printing & Lithographic Co.*, 433 F.2d 1058, 1061 (8th Cir. 1970), *cert. denied*, 401 U.S. 925, 91 S.Ct. 883, 27 L.Ed.2d 829 (1971).

Petitioner Buffalo argues on this appeal that the factual issues resolved by the credibility findings of the administrative law judge must be reversed. This court has stated, however, that:

> The rule in this Circuit is that "the question of credibility of witnesses and the weight to be given their testimony" in labor cases is primarily one for determination by the trier of facts. [citations omitted.] This Court is not the place where that question can be resolved, unless it is shocking to our conscience.

*NLRB v. Morrison Cafeteria Co. of Little Rock*, 311 F.2d 534, 538 (8th Cir. 1963). Although this rule is not to be applied mechanically so as to compel us to sustain any finding concerning conflicting testimonial evidence, *NLRB v. Payless Cashway Lumber Store of South St. Paul, Inc.*, 508 F.2d 24, 28 (8th Cir. 1974), here the record as a whole supports the credibility findings of the administrative law judge and the Board.

For example, although Hicks testified that he did not have any separate conversations with Egan during the August 13 meeting, Chris Van Lith and Glen Esterly, two Teamsters union representatives present at the meeting, testified that they observed a separate conversation between Egan and Hicks near the end of the meeting. Furthermore, the record reflects that Egan reported to two Union members

shortly after the August 13 meeting that Hicks said he would sign the contract.

When Hicks arrived at the meeting on August 13, it is clear that he was quite familiar with the terms of the employer association contract negotiated on July 17. All of the witnesses generally agreed that Hicks announced at the beginning of the meeting that he would accept the terms of the contract with only the one exception as to a lower rural rate. Following several hours of discussion in which the Union explained its firm position against a special rural rate because of the most favored nation clause,[4] it is not implausible that Hicks decided to forego his demands.

Finally, the record indicates that Union spokesman Pendzimas stated to Hicks that the Union would work harder in getting specified wage rates into all of the counties as a means of minimizing Buffalo's concerns. Therefore, Hicks may well have concluded that the problem he faced in rural counties would soon be lessened.

■ The testimony concerning the meeting was in direct contradiction. The administrative law judge chose to believe Egan. When a choice has been made between two fairly conflicting views, this court may not displace that choice even though we may have made a different choice had the matter been before us *de novo*. See *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In light of the fact that the record as a whole supports the credibility findings of the administrative law judge and the Board, we refuse to disturb the Board's finding of a violation of 29 U.S.C. § 158(a)(5) and (1).

The administrative law judge further found that on August 20 and 22, 1975, Hicks violated 29 U.S.C. § 158(a)(5) and (1) by engaging in negotiations directly and individually with employees in an attempt to bypass the Union which was recognized as the exclusive representative of Buffalo's employees.

Buffalo contends that at both meetings Hicks did nothing more than state in factual terms the same offer that had been previously made to the Union. The record reflects, however, that the communications by Hicks to the employees were more than information sessions. According to several Buffalo employees who testified before the administrative law judge, Hicks stated at the employees meeting that Buffalo was in financial difficulty and headed for bankruptcy if the present situation continued. Hicks further mentioned a proficiency report being prepared to be followed by the elimination of unprofitable operations and employees. Hicks asked the employees for a lower salary rate for rural areas, a proposal which the Union had previously refused. Egan corroborated this testimony and in addition testified that he informed Hicks prior to the first employee meeting that it was improper to conduct negotiations directly with the employees. Hicks replied that "he was going to have the meeting anyway."

■ The administrative law judge in his credibility findings commented:

> Hicks' testimony also as to whether he negotiated directly with employees on August 20 and 22 was particularly unimpressive. I discredit Hicks' testimony to the effect that Egan agreed that Hicks could talk to or negotiate with the employees directly. I also discredit Hicks' testimony to the effect that he did not negotiate directly with employees on August 20 and 22, 1975.

After examining the record and particularly the testimony of employees who attended the meetings we are persuaded that the above credibility findings are justified.

Although 29 U.S.C. § 158(a)(5) does not, on a per se basis, preclude an employer from communicating, in non-coercive terms, with employees during collective bargaining

---

4. The Union-employer association contract required that any concessions made to any other employer would have to be made to the employer association contractors.

negotiations, *Proctor & Gamble Mfg. Co.*, 160 N.L.R.B. 334, 340 (1966), our review of the record convinces us that Buffalo's actions in going directly to the employees were designed to achieve contract changes shortly after agreeing to sign a negotiated contract with the Union and, hence, resulted in an unfair labor act. *See NLRB v. Goodyear Aerospace Corp.*, 497 F.2d 747, 752 (6th Cir. 1974). As this court has stated:

> The National Labor Relations Act does not countenance negotiating with individual employees when they have bargaining representatives. *Medo Photo Supply Corp. v. N.L.R.B.*, 1944, 321 U.S. 678, 683–685, 64 S.Ct. 830, 88 L.Ed. 1007; *N.L.R.B. v. Lightner Pub. Corp.*, 7 Cir., 1940, 113 F.2d 621, 625; *N.L.R.B. v. Acme Air Appliance Co.*, 2 Cir., 1941, 117 F.2d 417, 420. It requires that representatives designated by the majority of employees shall be the *exclusive* collective bargaining representatives in respect to rates of pay, wages, hours of employment or other conditions of employment.

*Lion Oil Co. v. NLRB*, 245 F.2d 376, 378–79 (8th Cir. 1957).

The Board's findings on this issue are supported by substantial evidence on the record considered as a whole. It follows that the Board properly concluded that Buffalo violated 29 U.S.C. § 158(a)(5) and (1) by bypassing the Union and dealing directly with the employees.

The petition for review is denied and the Board's order will be enforced.