646 F.2d 1244
 107 L.R.R.M. (BNA) 2229, 91 Lab.Cas. P 12,707
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SUBURBAN FORD, INC., Respondent,
and
Automobile Transport Chauffeurs, Demonstrators & Helpers,
Teamsters Local 604, Intervenor-Petitioner.
 No. 80-1391.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 16, 1981.
Decided April 15, 1981.
 
 David A. Fleischer (argued), Atty., N. L. R. B., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for petitioner.
 Harris, Dowell, Fisher, McCarthy & Kaemmerer, Thomas W. McCarthy (argued), Chesterfield, Mo., for respondent.
 Before BRIGHT, STEPHENSON and McMILLIAN, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 The National Labor Relations Board (NLRB) petitions this court under section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e) (1976), for enforcement of its order directing Suburban Ford, Inc. (the Company), to bargain collectively with Local 604 of the Automobile Transport Chauffeurs, Demonstrators & Helpers Union (Local 604), representing the Company's salesmen, and Local 618 of the Automotive, Petroleum and Allied Industries Employees Union (Local 618), representing the Company's clerical workers. The NLRB found that after a majority of the Company's salesmen and clerical workers had signed authorization cards designating Local 604 and Local 618 as their collective bargaining representatives, the Company engaged in unfair labor practices that would tend to undermine the Unions' majority strength and impede the election processes. We conclude that substantial evidence on the record as a whole supports the NLRB's findings as to Local 604 but not as to Local 618. Accordingly, we deny enforcement of the Board's order as it pertains to Local 618 and grant enforcement of the order in all other respects.
 
 
 2
 I. Background.
 
 
 3
 On April 19, 1979, representatives of Local 604 met with five of the nine salesmen employed by Suburban Ford. By the next day, the Union received signed membership cards from six salesmen designating Local 604 as their collective bargaining representative. Shortly thereafter, a majority of the Company's clerical workers signed authorization cards designating Local 618 as their collective bargaining agent. After the Company declined to recognize the Unions on the basis of the signed authorization cards, Local 604 and Local 618 separately petitioned the Board for representation elections among each unit's employees.
 
 
 4
 On April 28, two days after the Unions' demand for recognition, new-car sales manager James Fitzgerald called salesman Robert Hawkins into the Company-owner's office to express his displeasure that Hawkins had joined a union. In particular, Fitzgerald stated, "Hawk, you of all people, I didn't think you'd do this to me." Fitzgerald also stated that he expected loyalty from his employees and that "he could have blown (Hawkins) out of (the Company) any time he wanted to when (Hawkins) was having bad months." That same day Fitzgerald also called salesman D. W. Van Ronzelen into the office and complained, "Van, you stabbed me in the back. * * * (Y)ou know very well that Mr. Hildebrand and I did not want a union in this store. * * * Have (you) looked up the definition of the word loyalty lately?"
 
 
 5
 Two days later at the Company's weekly sales meeting, Fitzgerald initiated a number of unprecedented actions. After indicating that the Company had experienced its worst April sales record in history, he ordered the replacement of the salesmen's demonstrators with less desirable vehicles and the transfer of new and used car salesmen between the two departments. Fitzgerald also canceled for "lack of interest" an ongoing bonus contest that offered the salesmen an opportunity to win a trip to Las Vegas or to a Missouri resort. Finally, the Company hired five new salesmen, most of whom had little or no experience in automobile sales, and four new clerical employees, three of whom were at least indirectly related to management officials.
 
 
 6
 During May, used-car sales manager Jerry Gilliam initiated at least a half-dozen conversations with Company salesmen concerning their support for Local 604. On one occasion, Gilliam approached Van Ronzelen in a tavern and commented, "(I)f you'll forget all this union nonsense, I'll make it very well worth your while." On several occasions, Gilliam made similar comments to Hawkins and during one conversation added, "(I)t won't do any good to bring a union in." In late May, when Hawkins indicated that he had joined Local 604 for the medical, dental, and pension benefits, Gilliam responded, "I can give you that", wrote on a paper napkin that Bob Hawkins would be guaranteed a job for five years if he sold ten or more cars a month, and signed his name.
 
 
 7
 Finally, on June 6, Gilliam chastized Hawkins for lending a demonstrator to a customer. When Hawkins attempted to explain that he had acted in accordance with Company policy under the circumstances and had received the permission of Company-owner Hildebrand to lend the vehicle, Gilliam refused to listen to these justifications and fired Hawkins. Two days later, Hawkins filed an unfair labor practice charge with the NLRB and delivered a copy of the complaint to Gilliam. Immediately after Gilliam showed the copy to Hildebrand and other management officials, the Company rehired Hawkins.
 
 
 8
 On the basis of this evidence, the NLRB found that the Company had violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) (1976), by accusing salesmen of disloyalty because of their union activity, soliciting grievances from salesmen to discourage union membership, threatening to discharge salesmen who engaged in union activity, promising benefits to salesmen who would abandon their support for Local 604, advising salesmen that unionization would be futile, and hiring new salesmen and clerical employees solely for the purpose of destroying the majority status of both Local 604 and Local 618. The NLRB also found that the Company had violated section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) (1976), by replacing the salesmen's demonstrators with less desirable vehicles, canceling the bonus contest, and discharging Hawkins for participation in union activities. The NLRB then determined that the salesmen and clerical employees constituted appropriate bargaining units, that Local 604 represented a majority of the salesmen and Local 618 held majority status among the clerical employees before the Company committed its violations of sections 8(a)(1) and 8(a)(3), and that the issuance of bargaining orders would better protect the employees' expression of support for the Unions than the use of traditional remedies to ensure fair representation elections.
 
 
 9
 II. Discussion.
 
 
 10
 A. Clerical Employees.
 
 
 11
 The NLRB's order to bargain with Local 618 primarily rests on the Board's admittedly novel theory that an employer violates section 8(a)(1) by hiring new employees solely for the purpose of destroying a union's majority status in the bargaining unit. The Board premises this theory on the view that "discrimination in hiring is twin to discrimination in firing." Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 187, 61 S.Ct. 845, 849, 85 L.Ed. 1271 (1941). Just as an employer may not discharge prounion employees to prevent them from voting in a Board election, neither should the employer be permitted to hire unnecessary antiunion employees for the purpose of diluting the voting strength of those employees already in the bargaining unit who support the union.
 
 
 12
 The Company answers that the Board cannot establish a violation of section 8(a)(1) upon a mere showing that an employer hired new employees solely for the purpose of destroying a union's majority status. To establish that the employer's addition of employees to the work force might dilute the union's majority status in the bargaining unit, the Board must also show that the new employees would be eligible to vote in the upcoming representation election under the Board's election rules and that these employees would likely vote against the union in a greater proportion than the existing employees in the bargaining unit.
 
 
 13
 We need not determine the merits of the Board's theory in this case because, in any event, the record does not support the Board's order to bargain with Local 618. To warrant the issuance of a bargaining order, the Board must find that
 
 
 14
 the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order. (NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 614-15, 89 S.Ct. 1918, 1940-41, 23 L.Ed.2d 547 (1969).)
 
 
 15
 The record in this case contains no substantial evidence that the Company's addition of four clerical employees to the bargaining unit after Local 618 had obtained majority status through signed authorization cards so tainted the election process as to justify supplementing traditional remedies with a bargaining order.
 
 
 16
 The Board argues, however, that it could reasonably find that the Company's unlawful conduct against the salesmen would also affect the fairness of the clerical workers' representation election because the two units worked in close contact with each other. This argument may carry some validity under some circumstances, but in this case the Board's finding lacks substantial evidentiary support in the record. Accordingly, we deny enforcement of the Board's order to bargain with Local 618.[1]
 
 
 17
 B. Salesmen.
 
 
 18
 The Board's order to bargain with Local 604, however, rests on several violations of section 8(a)(1) and section 8(a)(3) that would warrant the issuance of a bargaining order. For this reason, we grant enforcement of this order and need not determine whether the Company violated section 8(a)(1) by hiring additional salesmen solely for the purpose of destroying Local 604's majority status.
 
 
 19
 We recognize that for each violation of section 8(a)(1) and section 8(a)(3) charged by the Board, the Company presents an alternative view of the evidence or a legitimate business justification for its actions.[2] On factual issues, however, the Board's findings will be conclusive if supported by substantial evidence on the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This court cannot overturn the Board's choice between two fairly conflicting views of the evidence, even though we might justifiably take a different view were the matter before us de novo. Buffalo Bituminous, Inc. v. NLRB, 564 F.2d 267, 270 (8th Cir. 1977). Nor can this court pass on the credibility of the witnesses, weigh the evidence, or reject reasonable inferences made by the Board because other inferences might also be reasonably drawn.[3] Singer v. NLRB, 429 F.2d 172, 179 (8th Cir. 1970).
 
 
 20
 Applying these standards to the present case, we conclude that substantial evidence in the record as a whole supports the Board's findings that the Company engaged in unfair labor practices against its salesmen. In particular, the Board might reasonably infer from the coincidence in time between the salesmen's union activities and the Company's conduct that the employer acted with the intent of impeding the salesmen's efforts at unionization. Fitzgerald's conversations with Hawkins and Van Ronzelen occurred within two days after Local 604's request for recognition had been rejected by the Company. At the next weekly sales meeting, Fitzgerald canceled the bonus contest, transferred the salesmen between new and used car sales, and recalled the salesmen's demonstrators. In addition, Gilliam's efforts to dissuade the salesmen from union membership began during this period and continued until he ultimately fired Hawkins. Finally, the Company's reinstatement of Hawkins occurred only after it learned that Hawkins had filed an unfair labor practice charge with the Board. The Board could reasonably infer from the timing of these events that the Company interfered with, restrained, or coerced the salesmen in the exercise of their right to self-organization, in violation of section 8(a)(1), and discriminated against the salesmen in the terms and conditions of employment to discourage them from membership in Local 604, in violation of section 8(a)(3).
 
 
 21
 III. Conclusion.
 
 
 22
 We grant enforcement of the Board's order to bargain with Local 604, but deny enforcement of the order as to Local 618. The Company does not challenge any other remedial provisions of the Board's order, and these provisions will be enforced.[4]
 
 
 
 [1]
 Because of our disposition in this matter, we need not consider the Company's other challenges to the Board's order to bargain with Local 618
 
 
 [2]
 As to Fitzgerald's conversations with Hawkins and Van Ronzelen, the Company contends that Fitzgerald's references to disloyalty should be read as disloyalty to him, a long-time friend, not disloyalty to the Company. Similarly, Fitzgerald's statement to Hawkins that he could have fired Hawkins in prior months for low productivity arose in the context of personal loyalty to Fitzgerald rather than as a threat of discharge. As to Gilliam's statements, the Company argues that the employees to whom Gilliam spoke had no reasonable basis to believe that Gilliam, a low-ranking supervisor, spoke or acted on behalf of management in soliciting grievances and promising benefits to those employees who would abandon their support for the Union. As to the Company's hire of new employees, cancellation of the bonus contest, issuance of less desirable demonstrators to the salesmen, and transfer of salesmen between new and used car sales, the Company attributes its actions to economic necessity rather than antiunion animus. Finally, the Company maintains that Gilliam fired Hawkins without authority and merely out of a personal pique, a decision which the Company immediately rectified upon learning of the discharge
 
 
 [3]
 The Company urges us to review the entire record rather than accept the administrative law judge's findings and credibility resolutions at face value because the administrative law judge allegedly manufactured evidence, disregarded parts of testimony from witnesses he claimed to have credited, credited testimony that was contradicted by other credited witnesses, ignored uncontradicted testimony from witnesses not discredited, quoted his own statements made at the hearing rather than the testimony of witnesses, quoted testimony out of context, repeatedly argued with witnesses during the hearing, and effectively prohibited the Company from making an offer of proof. See NLRB v. Huntington Hospital, Inc., 550 F.2d 921, 924 (4th Cir. 1977) (trial examiner's report and Board's findings will not be accorded presumption of correctness usually attributed to trier of fact if material uncontradicted evidence has been ignored or if evidence has been disregarded or eliminated by casual expedience of discrediting an employer's witnesses); NLRB v. Miami Coca-Cola Bottling Co., 222 F.2d 341, 345 (5th Cir. 1955) (bias of administrative law judge requires court review of credibility resolutions); Local No. 3, United Packinghouse Workers of America v. NLRB, 210 F.2d 325, 330 (8th Cir. 1954) (manifest prejudice, bias, and hostility of examiner goes far to weaken or destroy presumption of correctness usually attributed to findings of trier of fact)
 Having carefully reviewed the record in light of these allegations, we reject the Company's allegations as substantially without merit.
 
 
 [4]
 Company counsel has advised us that the Company has recently ceased operations, although nothing to this effect appears in the record. Under settled precedent, however, the Company's closing does not render this case moot. See NLRB v. Bell Co., 561 F.2d 1264, 1266 n.2 (7th Cir. 1977); NLRB v. Aircraft Engineering Corp., 419 F.2d 1303, 1304 (8th Cir. 1970)