653 F.2d 1091
 107 L.R.R.M. (BNA) 3307, 91 Lab.Cas. P 12,897
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
GIBRALTAR INDUSTRIES, INC. and Case, Inc., Respondents,
and
International Ladies' Garment Workers' Union, AFL-CIO and
Upper South Department International Ladies'
Garment Workers' Union, AFL-CIO, Intervenors.
 No. 78-1474.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 15, 1980.
Decided and Filed July 20, 1981.
 
 Elliott Moore, Peter Bernstein, Deputy Associate Gen. Counsel, Richard Cohen, N.L.R.B., Washington, D. C., Emil Farkas, Director, Region 9, N.L.R.B., Cincinnati, Ohio, for petitioner.
 Stanley Israel, Kliegman, Israel & Cooper, New York City, for respondent.
 Herbert L. Segal, Irwin H. Cutler, Jr., Kathleen Pellegrino, Louisville, Ky., Max Zimny, Ann Hoffman, International Ladies' Garment Workers' Union, New York City, for intervenor International Ladies' Garment Workers' Union, AFL-CIO and the Upper South Department, International Ladies' Garment Workers' Union, AFL-CIO.
 Before WEICK and ENGEL, Circuit Judges, and PECK, Senior Circuit Judge.
 ENGEL, Circuit Judge.
 
 
 1
 This case is before the court upon the application of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. ("NLRA"), for enforcement of its order issued against respondents, Gibraltar Industries, Inc. and Case, Inc., dated August 24, 1978, and reported at 237 NLRB No. 60. The Board's order required Gibraltar to (1) cease and desist from interfering with employees in the exercise of their Section 7 rights, (2) bargain with the intervenor, International Ladies' Garment Workers' Union ("ILGWU" or "Union"), (3) re-establish operations at Olive Hill, Kentucky, and (4) offer the laid off employees reinstatement and make them whole for any loss of earnings.
 
 
 2
 This order was based, in part, upon a finding that Gibraltar had violated Section 8(a)(1) of the NLRA by creating the impression that employees' union activities were under surveillance, coercively interrogating employees about union activities and threatening plant closure if the ILGWU succeeded in its organizing campaign, and otherwise interfering with the employees' right to organize. The Board also found that Gibraltar had violated Section 8(a)(5), (3) and (1) by failing to bargain in good faith on wages with the ILGWU, closing its Olive Hill plant and transferring work to a facility located in New York, and insisting that any negotiations regarding the effects of the closure take place in New York, over the phone or through the mail.
 
 
 3
 At the same time, the Board ordered Case to cease and desist from interfering with its employees' Section 7 rights. The Board required Case to reinstate a discharged employee, Anita Wilburn, with back pay, finding that her termination had been motivated by anti-union animus. All references in her employment record regarding alleged poor work were to be expunged. In addition, the results of a union representation election which Upper South (a local of the ILGWU) had lost were to be reopened and retabulated. Even if the Union did not carry a majority, Case was to bargain collectively with Upper South.
 
 
 4
 This order was based upon a finding that Case had violated Section 8(a)(1) by threatening its employees with loss of work if the Union prevailed in the election, interrogating employees about their Union activities, and coercing other employees into campaigning against the Union. The Board also found that Upper South had attained majority status in an appropriate unit and that Case's refusal to recognize and bargain with Upper South violated Section 8(a) (5) and (1) of the NLRA.
 
 
 5
 Three major issues are presented by this appeal. First, did Gibraltar fail to bargain in good faith with the ILGWU and was its subsequent plant closure unlawful under the NLRA? Second, did Case unlawfully discharge Anita Wilburn because of her union support? Third, did Case engage in unlawful anti-union activities, thereby prejudicing the representation election and requiring a bargaining order? Under the law, the NLRB's decision must be upheld if there is substantial evidence on the record as a whole to support the Board's findings.
 
 
 6
 "(s)ubstantial evidence is more than a mere scintilla." ... (I)t "must do more than create a suspicion of the existence of the fact to be established.... it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."
 
 
 7
 Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 456, 95 L.Ed. 456 (1951) (quoting Labor Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)).
 
 I.
 
 8
 Gibraltar manufactures sleeping bags and other quilted materials at a facility located in Brooklyn, New York. In early 1976, Gibraltar began manufacturing sleeping bags in a facility located in Olive Hill, Kentucky. Nevertheless, the lions' share of Gibraltar's business remained in New York, where employees had been represented by the ILGWU and the Amalgamated Clothing Workers of America.
 
 
 9
 Gibraltar's Olive Hill plant consisted of several sewing and quilting machines operated by seventeen employees. During the summer of 1976, the ILGWU began an organizational effort at Olive Hill. On October 12, 1976, the ILGWU was certified as the exclusive collective bargaining representative of a unit of production, maintenance, shipping and receiving employees, pursuant to an election held on October 1, 1976.
 
 
 10
 Case manufactures clothing at a facility located in Olive Hill. It regularly performs subcontract work for Gibraltar. In 1976, Case employed approximately 200 workers. Early that year, Upper South, a local division of the ILGWU, began an organizational effort at the Case plant. Authorization cards were collected and an election was held on November 16, 1976. The employees cast ninety-four votes for Upper South and ninety-seven votes against; nine ballots were challenged on the ground that the employees were not members of the appropriate unit.
 
 II.
 
 11
 The Board and the Union contend that Gibraltar failed to negotiate in good faith after the ILGWU had been certified as the exclusive bargaining representative of the garment workers at Gibraltar's Olive Hill plant. The Union presented a contract to Gibraltar containing approximately thirty-seven major provisions. Although agreement was had on nearly thirty provisions, Gibraltar and the Union failed to agree on certain "economic items" which included wage rates, overtime policy, piece-work rates, and health care benefits. Contract negotiations lasted over a two month period; however, there were only two actual negotiating sessions. The course of events is summarized in the margin.[1]
 
 
 12
 Gibraltar claims it did not refuse to negotiate on "economic terms"; rather, it proposed a "two-year pass," that is, a two-year contract embracing the thirty mutually accepted terms but maintaining current wage and benefit levels. Gibraltar asserts that the nature of its operations (much of it being government contract work obtained on a low bid basis), as well as economic necessity and market conditions required a wage/benefit freeze until enough business could be obtained to sustain profitability. The Board, however, found that the company had not negotiated in good faith, noting Gibraltar's refusal to compromise on the "two-year pass" position and interpreting the company's pre-election activities (for example, interrogation and promise of benefits) as evidence of anti-union animus.
 
 A.
 
 13
 Upon a thorough review of the record as a whole, we cannot find substantial evidence to support the Board's findings. First, Gibraltar's pre-election statements and actions were not violative of the NLRA and do not demonstrate a hostile attitude toward the Union. Rather the record shows that Gibraltar's management viewed unionization as a prelude to increased wages and costs which would in turn prevent the Olive Hill plant from turning a profit. Gibraltar operated a much larger plant in New York, and Mr. Foreman, the president of Gibraltar, believed the Olive Hill work could be performed in New York if a profit could not be earned in Olive Hill. As evidenced by the entire record, Mr. Foreman's attitude was that of a rational businessman concerned about minimizing costs, a particularly relevant concern for a business that is involved in government contracts.
 
 
 14
 There was no evidence of any personal dislike for unions on Mr. Foreman's part; in fact, Gibraltar was unionized in New York. The record indicates that the company had a history of relationships with both the ILGWU and the Amalgamated Clothing Workers in New York.
 
 
 15
 Likewise there is no evidence that certain remarks of a subordinate supervisor created an atmosphere of surveillance at the plant. The suspect statements were abbreviated and ambiguous, occurred only twice, and were made privately to one other employee. Furthermore, we find no evidence that Mr. Foreman threatened plant closure or loss of work if the employees unionized; rather, Mr. Foreman's informal comments described the effect of a negotiation stalemate and possible strike on plant operations. In this particular instance, his statements did not transgress the free speech limitations articulated in NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).
 
 
 16
 The Administrative Law Judge took notice of a local newspaper article wherein Mr. Foreman was quoted as saying he would not be forced by anyone to do anything regarding the operation of the Olive Hill plant. At the administrative hearing, the reporter who interviewed Foreman was uncertain about the conversation and admitted that he had not reported the full context of Foreman's comments. Even if the article is accurate, it is at best ambiguous. The article provides no evidence that Foreman refused to negotiate, but only that he would not be told how to operate his company. These statements followed upon the heels of negotiations during which the company opposed union involvement in setting piece-work rates for government contract bids, in itself not an unreasonable bargaining position.
 
 
 17
 Finally, the record clearly demonstrates that Gibraltar negotiated and eventually agreed with the Union on many proposals. The Union requested and the company provided information on wage rates, job classifications, vacation policies and benefit programs. Gibraltar even made advantageous proposals on overtime rates. There also was testimony by the principal ILGWU organizer indicating the company's willingness to negotiate. Granted, Gibraltar stoutly resisted Union efforts to increase the basic wage package and to involve the Union in setting piece-work rates. Yet, it was no more unfair under the circumstances for the company to maintain this position than it was for the Union to press its demands. This was hard bargaining, the kind countenanced by the NLRA as an inevitable aspect of labor-management relations. It was not unfair bargaining. See NLRB v. United Clay Mines Corp., 219 F.2d 120 (6th Cir. 1955). See also McCourt v. California Sports, Inc., 600 F.2d 1193, 1200 (6th Cir. 1979); Fetzer Television, Inc. v. NLRB, 317 F.2d 420, 424 (6th Cir. 1963). In short, the evidence clearly shows that a bargaining impasse was reached.
 
 B.
 
 18
 Once negotiations came to an impasse, Gibraltar could temporarily close the Olive Hill plant for bargaining reasons. American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). Furthermore, the company could terminate its business operations for purely economic reasons without transgressing the NLRA. First National Maintenance Corp. v. NLRB, --- U.S. ----, 101 S.Ct. 2573, 68 L.Ed.2d --- (1981); NLRB v. R. C. Mahon Co., 269 F.2d 44 (6th Cir. 1959). As we have indicated, the record does not support the Board's finding that Gibraltar was motivated by anti-union animus when it closed its Olive Hill plant; rather, the evidence shows a legitimate business reason (i. e., abandoning a non-profitable operation) for Gibraltar's decision.
 
 
 19
 However, the Board also found that Gibraltar had failed to negotiate with the Union regarding the effects of closing the Olive Hill plant. Upon review of the record, we believe Gibraltar stood ready and willing to negotiate regarding the effects of its decision to close the Olive Hill plant. On December 20th, Gibraltar wrote Mr. Janis, the principal Union negotiator, expressing a willingness to discuss effects. Given the circumstances, Gibraltar's desire to pursue discussions in New York does not detract from its expressed willingness to negotiate. Since the Olive Hill plant was closed, and both the Union and Gibraltar had their headquarters in New York, we see nothing unlawful or unreasonable with Gibraltar's request. As we read the record, the Union has failed to pursue Gibraltar's suggestion and in fact, has made little or no effort to discuss effects associated with the Olive Hill plant closure. See NLRB v. Royal Plating & Polishing Co., 350 F.2d 191, 197 (3rd Cir. 1965).
 
 
 20
 The Union also claimed Gibraltar violated its duty to bargain by failing to supply information on the company's costs, profits and losses, customer orders and cancellations, and comparative data on the efficiency of the New York and Olive Hill plants. Union representative Janis requested this information by letter after the Olive Hill plant had been closed. Gibraltar refused to comply with this request, asserting that the information was irrelevant to discussions on the effects of the Olive Hill plant closure.
 
 
 21
 In NLRB v. Truitt Manufacturing Co., 351 U.S. 149, 152-53, 76 S.Ct. 753, 755, 100 L.Ed. 1027 (1956), the Supreme Court stated:
 
 
 22
 Good faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy.
 
 
 23
 However, the Court did not establish a per se rule:
 
 
 24
 We do not hold, however, that in every case in which economic inability is raised as an argument against increased wages it automatically follows that the employees are entitled to substantiating evidence. The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met.
 
 
 25
 Id., at 153-54, 76 S.Ct. at 756. Only recently the Supreme Court reaffirmed its decision in Truitt that the duty to supply information turns upon the circumstances of each particular case. Detroit Edison Co. v. NLRB, 440 U.S. 301, 314, 99 S.Ct. 1123, 1130, 59 L.Ed.2d 333 (1979). Thus, although the duty to supply information inheres in the obligation to bargain in good faith, this duty is not unyielding or invariable.
 
 
 26
 In General Electric Co. v. NLRB, 466 F.2d 1177, 1182 (6th Cir. 1972), our court held:
 
 
 27
 (I)f the requested data is relevant and, therefore reasonably necessary to a union's role as bargaining agent in the administration of a collective bargaining agreement, it is an unfair labor practice within the meaning of Section 8(a)(5) of the Act for an employer to refuse to furnish the requested data. (Emphasis supplied).
 
 
 28
 See also NLRB v. Rockwell-Standard Corp., 410 F.2d 953, 957 (6th Cir. 1969); NLRB v. J. P. Stevens & Co., Gulistan Div., 538 F.2d 1152, 1164 (5th Cir. 1976) (information that is relevant and requested must be supplied). And as our court indicated in NLRB v. Goodyear Aerospace Corp., 497 F.2d 747 (6th Cir. 1974), the duty to supply information can be measured by the scope of the obligation to negotiate which, in turn, may depend on the actual state of employer-union discussions at any particular point in time.
 
 
 29
 At no time during the two month period prior to the Olive Hill plant closure did the Union request information on Gibraltar's profitability. Only after the two parties reached impasse and Gibraltar lawfully ceased its Olive Hill operation did the Union request financial and wage information. Yet, at this point, the information requested was not relevant to discussions on the effects of the Olive Hill plant closure. Since Gibraltar was under no absolute obligation to negotiate with the Union on its decision to close the Olive Hill plant, First National Maintenance Corp., supra; Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 223, 85 S.Ct. 398, 409, 13 L.Ed.2d 233 (1964) (J. Stewart concurring); Levine v. C & W Mining Co., 610 F.2d 432, 438 (6th Cir. 1979); NLRB v. Acme Industrial Products, Inc., 439 F.2d 40, 42-43 (6th Cir. 1971), nor to continue actual contract negotiations once the Olive Hill operations were lawfully terminated, the requested information could not be compelled on these grounds. Cf. Goodyear Aerospace Corp., supra.
 
 III.
 A.
 
 30
 As for Case, based upon our review of the entire record, substantial evidence supports some but not all of the Board's unfair labor practice determinations.
 
 
 31
 We do not find substantial evidence to support the Board's finding that Gene Case, the president of the company, coercively interrogated his employees in violation of the NLRA. Mr. Case's inquiries into individual employee sentiment and opinion on the subject of unionization were sporadic, occurred in the general work area, and had no discernible effect on employee actions or attitudes. The ALJ inferred ill-will toward Upper South and individual employees from these isolated events. Such inferences are not supported by the record. Moreover, there was insufficient evidence that Mr. Case knowingly utilized plant supervisors to put pressure on individual employees.
 
 
 32
 On the other hand, there is substantial evidence for the Board's conclusion that Case had committed an unfair practice by interfering with the union representation election. Mr. Case requested Gibraltar's president, Mr. Foreman, to speak to Case employees about the election procedures. This, in itself, was not improper. Foreman visited the Case plant on three separate occasions to explain election procedures to the same group of employees. One speech occurred in September and another in November, approximately two weeks before the election. A third speech was given the day before the election. However, the evidence demonstrates that Foreman instructed the Case workforce on more than election procedures. It is clear that during these speeches Foreman painted a rather glum future for Case employees in the event of unionization. His comments were of a general nature and carried a veiled but strong threat of serious economic repercussions if Upper South won the election. As the ALJ noted, many of his comments were "based on unwarranted hypothetical assumptions." It must also be remembered that Mr. Foreman was well-known to Case employees as one of their company's principal customers. His statements as to the effect of the ILGWU's bargaining demands on Gibraltar's Olive Hill plant tended to characterize unionization as a threat to Case's business and, in turn, to its employees' livelihoods. Such a speech violates the rule established in Gissel :
 
 
 33
 (A)n employer is free to communicate to his employees any of his general views about unionization or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal of force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case, however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control
 
 
 34
 ....
 
 
 35
 Gissel, supra, 395 U.S. at 618, 89 S.Ct. at 1942 (emphasis supplied). See also NLRB v. Southern Electronics Co., 430 F.2d 1391 (6th Cir. 1970).
 
 B.
 
 36
 As for Anita Wilburn, we have reviewed the record and find substantial evidence to support the Board's finding of a discriminatory discharge. As noted by the ALJ, Wilburn's work at the Case plant had been satisfactory; in fact, she had been working at Case for approximately six months without any complaint as to the quality of her performance. When Wilburn returned from a period of maternity leave, she became active in the Upper South unionization effort. Mr. Case and another supervisor asked Wilburn about her feelings toward the company and union. We do not find these questions to be unlawful in themselves. Yet, as noted by the ALJ, it was only after Wilburn continued to express her support for the union in the upcoming election (which included wearing a T-shirt which read "Dear Gene: If you bug me, the government will get thee") that complaints about her work began to materialize. In fact, a few days after Wilburn refused to divulge who had printed the T-shirt she received her first warning. Within a month Wilburn had rapidly received a series of warnings, was suspended, and finally was discharged.
 
 
 37
 When the record establishes a prima facie case that "the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him." NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 34 (87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027) ... (1967).
 
 
 38
 NLRB v. Armcor Industries, Inc., 535 F.2d 239, 243 (3rd Cir. 1976). See also NLRB v. Eastern Smelting & Refining Corp., 598 F.2d 666 (1st Cir. 1979). Considering all the circumstances surrounding the discharge, a prima facie case of discrimination was proved, and the ALJ properly determined that there was insufficient evidence of a legitimate motivation for the discharge.
 
 C.
 
 39
 Finally, we must determine whether the Board's bargaining order is appropriate on the record before us. Case has asserted before the ALJ and on appeal that the authorization cards signed by Case employees were invalid since the Union procured these cards by misrepresenting their purpose. We conclude that substantial evidence supports the ALJ's rejection of this claim. In Gissel the Supreme Court stated:
 
 
 40
 There is nothing inconsistent in handing an employee a card that says the signer authorizes the union to represent him and then telling him that the card will probably be used first to get an election.
 
 
 41
 Gissel, supra, 395 U.S. at 606-07, 89 S.Ct. at 1936. Thus there is support for the Board's conclusion that the authorization cards were valid and indicated majority support for the union.
 
 
 42
 Nevertheless, as we stated in Donn Products, Inc. v. NLRB, 613 F.2d 162, 165 (6th Cir. 1980), "The Supreme Court (has) made it clear ... that an election remains the preferred method of determining the choice by employees of a collective bargaining representative." In Gissel, the Supreme Court specified two categories of unfair labor practices that could warrant the entry of a collective bargaining order: (1) " 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices," and (2) "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." Gissel, supra, 395 U.S. at 613-14, 89 S.Ct. at 1940. In our view, however, the conduct here comes within that "third category of minor or less extensive unfair labor practices, which because of their minimal impact on the election machinery, will not sustain a bargaining order." Gissel, supra, 395 U.S. at 615, 89 S.Ct. at 1940. See also Donn Products, supra, 613 F.2d at 165.
 
 
 43
 The remarks made by Mr. Foreman to Case employees at the three separate meetings do not, on the record before us, rise to the level of an "exceptional case" involving "outrageous and pervasive" conduct.[2] In his decision, even the ALJ stated that standing alone, Foreman's pre-election speeches may not have violated Section 8(a)(1).
 
 
 44
 However, even if these speeches and the improper discharge tended to impede the election process and fall within the second category of unfair labor practices, such unfair practices must be considered "in terms of their past effect on election conditions and the likelihood of their recurrence in the future." Gissel, supra, 395 U.S. at 614, 89 S.Ct. at 1940. We take this opportunity to repeat and to emphasize the Third Circuit's observation:
 
 
 45
 In light of the general and highly desirable practice in industrial relations of selecting bargaining representatives through traditional election processes, a rule requiring the Board to set forth a reasoned analysis justifying a bargaining order under Gissel is salutary.
 
 
 46
 Armcor, supra, 535 F.2d at 244. Our court has consistently refused to enforce bargaining orders where the Board's decision was tantamount to " 'a litany, reciting conclusions by rote without factual explication.' " NLRB v. East Side Shopper, Inc., 498 F.2d 1334, 1336 (6th Cir. 1974) (quoting NLRB v. American Cable Systems, Inc., 427 F.2d 446, 449 (5th Cir. 1970)). See also NLRB v. Essex Wire Corp., 496 F.2d 862, 863 (6th Cir. 1972). Particularly applicable to this case is our decision in Donn Products :
 
 
 47
 The Board made no findings or detailed analysis as to the residual impact or continuing effect, or the likelihood of recurrence, of any of the unfair labor practices .... (C)ourts are not required to enforce bargaining orders based on conclusory statements unsupported by sufficient facts.
 
 
 48
 Donn Products, supra, 613 F.2d at 166.
 
 
 49
 The lack of analysis regarding the residual impact of the unfair labor practices is fatal to the bargaining order directed to Case, especially where we have found that the record does not support many of the Board's unfair labor practice determinations. In these circumstances, we believe the purposes of the NLRA and the stability of industrial relations will be served best not by a bargaining order, but by the union seeking another election if so desired. See Donn Products, supra. Our decision to uphold the unfair labor practice charges, based upon Mr. Foreman's pre-election remarks and Anita Wilburn's unlawful discharge, as well as the passage of time, should not only deter any possible efforts to subvert the election process, but should fully remove any taint from the prior violations.
 
 
 50
 Accordingly, the Board's findings regarding Gibraltar's violations of the NLRA are reversed and enforcement of the entire remedial order against Gibraltar is denied. The Board's findings regarding Case's violations of the NLRA are reversed in part and affirmed in part; those unfair labor practice findings pertinent to Wilburn's illegal discharge and Mr. Foreman's threatening pre-election speeches are affirmed and all others are reversed. The remedial order is partially enforced, to the extent that it requires reinstating Wilburn with appropriate retroactive benefits and relief to make her whole, and expunging her employment record of the warnings, suspension and discharge. The order enjoining Case from further unfair labor practices is enforced to prevent any interference with the employees' exercise of their Section 7 rights. All other aspects of the remedial order, including the bargaining order issued against Case, are denied enforcement.
 
 
 
 [1]
 October 19, 1976 The Union delivers its contract proposal to Gibraltar, containing thirty-seven provisions. Gibraltar requests time to study the proposal
 October 27, 1976 The Union and Gibraltar meet and begin negotiations. Agreement is obtained on numerous provisions, but no wage increases.
 November 1, 1976 Gibraltar writes the Union regarding additional suggestions and acceptable provisions but remains adamant on wage increases.
 December 9, 1976 The Union and Gibraltar again meet, after Gibraltar has laid off employees. Gibraltar expresses its willingness to sign the contract as then negotiated, incorporating existing wage and benefit levels. It suggests a two-year contract with further negotiations after the contract expires. The Union rejects this proposal.
 December 17, 1976 Gibraltar contacts the Union indicating no changes in wages are possible. No agreement is reached.
 December 20, 1976 Gibraltar writes the Union informing it of the decision to close the Olive Hill plant.
 December 21, 1976 The Union writes Gibraltar requesting a negotiating session and additional discussions on the effects of the plant closure.
 December 28, 1976 Gibraltar writes the Union proposing to discuss effects in New York.
 January 6, 1977 The Union writes Gibraltar suggesting a meeting in Kentucky or other convenient place to discuss effects and requesting information on profits, losses, and other economic data concerning the New York and Olive Hill operations.
 January 17, 1977 Gibraltar writes the Union refusing to supply information and again suggesting a meeting in New York or negotiations over the phone or through the mail.
 
 
 [2]
 Although we have upheld the Board's determination that Wilburn was illegally discharged, her discharge did not occur until after the election