**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 07a0127n.06**
**Filed: February 15, 2007**

**No. 06-1285**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| National Labor Relations Board, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON APPLICATION FOR ENFORCEMENT |
| | ) | OF AN ORDER OF THE NATIONAL |
| Newcor Bay City Division of Newcor, Inc., | ) | LABOR RELATIONS BOARD |
| | ) | |
| Respondent. | ) | |

Before: BATCHELDER, GILMAN, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge. The National Labor Relations Board seeks enforcement of the Board's November 8, 2005 Order. Acting on a charge filed by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, ALF-CIO, and Local 496 ("Union"), the Board's general counsel issued a complaint alleging that Newcor committed unfair labor practices when it unilaterally implemented its final contract proposal in the absence of a bargaining impasse and failed to provide information requested by the Union in a timely fashion, in violation of the National Labor Relations Act, 29 U.S.C. §§ 8(a)(5) and (1) ("the Act"). The ALJ held that Newcor violated the Act by failing to provide the Union with requested pension information in a timely fashion and by unilaterally implementing its final contract proposal when a valid impasse did not exist. The Board affirmed the ALJ's rulings, findings, and conclusions, and

adopted the ALJ's recommended order. Because the Board's conclusions are supported by substantial evidence, we grant enforcement of the Board's order.

## I. Background

Newcor designs and manufactures machinery at its Bay City, Michigan, facility. The Union has been the collective bargaining representative for Newcor's hourly employees for at least thirty years and the most recently negotiated collective bargaining agreement ("CBA") between the Union and Newcor was set to expire at midnight on June 10, 2004. Five hours prior to the deadline and after several bargaining sessions between the parties, Newcor representatives presented the Union with a final proposal and stated that the proposal would be implemented the following day because the parties had reached an impasse.

### A. The Bargaining Sessions

The Union and Newcor met seven times during May and June 2004 to negotiate a new CBA. The first bargaining session was held on May 11, 2004. At this meeting, Newcor representatives made it clear to the Union that economic realities necessitated cuts in wages and benefits and Newcor distributed a proposal to the Union that was, in the words of Scott Wright, Director of Human Resources at Newcor, "ugly." Among the concessions and cuts in Newcor's initial proposal was a 12% reduction in wages for bargaining unit employees; freezing of the pension plan, meaning that current employees would get no credit for additional years of service and new employees would be excluded from the plan; termination of supplemental pension payments, or "bridge money," to

retirees; elimination of dental and sickness/accident insurance; a less-generous health insurance plan; an increase in employee contributions towards health insurance premiums; elimination of the employer-subsidized "sub fund," which provided payments to laid-off bargaining unit members; a reduction in the number of paid holidays; a reduction in the number of vacation days for employees with fifteen or more years seniority; and a reduction in benefits for sick, injured, and laid-off employees.

The parties met again on May 20, 2004, and the Union committee presented its proposal. The Union's proposal sought increases in benefits, including an increase in wages; an increase in pension benefits for retirees; a reduction in the penalty for early retirement; an increase in the size of supplemental pension payments; an increase in dental benefits; an increase in the amount of weekly accident/sickness payments; the elimination of health insurance co-payments; an increase in the premium paid for night shift work; an increase in the employer-subsidized "sub fund" for bargaining unit employees receiving unemployment compensation; additional paid holidays; additional vacation days for employees with 30 or more years' seniority; an extension of the provision of health insurance benefits to laid off employees from two months to four months; and an increase in the amount of life insurance coverage. A number of non-economic proposals was also included.

Jim Nicoson, General Manager of Newcor, expressed his frustration with the Union's proposal in light of the need for concessions from the Union. Don Petro, a Union representative, told the Newcor representatives that the Union committee had listened to Newcor's proposal and that the

Newcor representatives should listen to the Union's proposal because it was merely a "starting point" for negotiations. Petro suggested that the parties begin the negotiations by considering the noneconomic issues in order to get the ball rolling on negotiations. By the end of the meeting, the parties had tentatively agreed on a number of noneconomic issues, and the Union committee agreed to withdraw some of its noneconomic proposals.

The parties met again on May 26 and June 3. During these bargaining sessions, the parties discussed issues of health insurance and pension benefits. Although Newcor presented the Union with information purporting to show the costs associated with wages and benefits, the Union questioned the figures used by Newcor, especially the figures purporting to show the cost savings associated with the concessions in Newcor's proposal. For example, according to Newcor, the biggest savings would come from the freeze of the pension plan and the elimination of supplemental pension payments, which would reduce the hourly cost of the pension plan from $12.27 to zero. When the Union committee questioned the figures, Nicoson responded that the figure of $12.27 "can be any number we want it to be."

At the fifth bargaining session on June 7, the Union presented a new proposal. Regarding pay, the Union proposed a $1 per hour reduction in pay for bargaining unit employees with no increases for four years, and a $4 per hour reduction in pay for new employees with no increases for four years. The Union committee believed that the proposal would reduce costs in the near term given some recent retirements, but Newcor's representatives responded that such a proposal would not result in immediate cost savings because a number of employees were still on layoff and had

recall rights. On the issue of health insurance, the Union agreed to Newcor's proposal that the old plan be abandoned and accepted a cap on monthly, per-employee contributions to premiums made by Newcor, although the caps proposed by the Union were higher than those proposed by Newcor. The Union also proposed a cut in the period during which accident/sickness payments would be made and agreed to an elimination of supplemental pension payments after January 1, 2008. The Union proposed a new 401(k) program for new employees. The Union agreed to the elimination of dental insurance, to a decrease the number of paid vacation days, and to a number of other concessions, and eliminated some of its own demands. Nicoson responded that the concessions in the Union's proposal were not enough.

At the sixth bargaining session on June 9, 2004, the parties continued to discuss economic issues and Nicoson told the Union committee that Newcor was not price competitive and that the company needed the Union to agree to the company's proposed concessions.

The final meeting of the parties took place on June 10. At the request of the Union committee, Newcor representatives provided the committee with a document setting forth the anticipated cost savings resulting from Newcor's pension plan proposals. However, the information did not address the Union's interest in determining the costs associated with keeping the pension plan in place given that a large number of bargaining unit members had recently retired. In response to a request that the CBA be extended to accommodate further negotiations, Nicoson stated that the parties needed to reach an agreement that day, that it would be detrimental for Newcor if customers

knew that Newcor was operating without an agreement with its union, and that customers might take their business elsewhere.

The Union committee met in an attempt to put together a new proposal, although the committee thought that it was hindered by a lack of information from Newcor. At around 2 p.m., Nicoson and Wright asked the Union committee for its new proposal. Petro told them that the committee was frustrated since it was trying to develop a new proposal without information it felt it needed and Nicoson responded that the committee did not have any information requests outstanding. Petro asked Wright what Newcor intended to do if the Union was unable to come up with a new proposal because of a lack of information and Wright responded that Newcor would implement its last proposal at midnight. This was the first mention of the possibility of impasse and unilateral implementation.

The Union committee presented the Newcor representatives with a written information request at this meeting because, according to Petro, the committee needed to document its requests in light of the threat of unilateral implementation of Newcor's proposal. The information request stated that the requested information was needed to enable the Union to evaluate the company's proposals and that it would be difficult for the Union to develop proposals without the requested information. The information request was for a variety of information, some of which had been requested previously. Newcor representatives stated that they needed time to look over the request and suggested that the parties take a break for dinner and reconvene at around 7 p.m.

When the parties returned to the negotiating table at 7 p.m., the Newcor representatives presented two documents to the Union committee. The first was a letter stating that "the negotiations have reached the point at which any further bargaining at this time would be futile because the positions of both Newcor and Local 496 are firm and are not close to agreement." The letter also disputed the Union's claim that it needed more information. The second document was "Management Final Proposal to UAW, Local 496, June 10, 2004." Nicoson stated that the parties were at impasse and that Newcor would implement its final proposal the next day upon expiration of the existing CBA.

When Nicoson presented the final proposal, he was told by Jeffrey Ryan, a member of the Union committee, that the parties were not at impasse and that the Union committee was still open to talking about anything. Several Union committee members testified that they did not think the parties were at impasse.

### B. The Census Data

The Union witnesses testified that, at the June 7 meeting, Petro requested census data for the pension plan, which includes names, seniority, and dates of birth of employees. According to Petro, he received some requested pension information at the June 9 meeting, but that the envelope did not include the census data. Petro stated that he did not tell Wright that the census data was missing because Petro had not yet had a chance to review the documents.

Nicoson testified that Petro did not ask for census data, but that Petro requested "5500 forms" and any related pension information that was available. Wright also testified that Petro did not specifically request census data and that Wright gave the requested pension information to Petro at the June 10 meeting.

On June 18, 2004, Petro sent a letter to Nicoson regarding outstanding information requests, including the census data. In a letter dated July 6, 2004, Wright told Petro that the Union had not made any information requests prior to June 10, 2004. Finally, on September 29, 2004, Wright sent Petro a letter and included a printout of the pension information. The letter stated: "Please note the enclosed pension census information, which I missed copying back in June."

**C. The Complaint and the ALJ's Decision**

The Union filed a charge alleging that Newcor violated the Act by failing and refusing to bargain in good faith in violation of §§ 8(5) and (1) of the Act. Specifically, the Union alleged that Newcor violated the Act by: (1) failing to provide information to the Union that was relevant to bargaining (the census data); and (2) implementing unilaterally Newcor's final offer when the parties were not at impasse. The Regional Director for Region 7 of the Board, on behalf of the General Counsel, thereafter issued a complaint against Newcor for alleged violations of the Act.

The ALJ agreed with the General Counsel that Newcor had failed to provide the requested census data in violation of the Act because an employer's duty to bargain in good faith encompasses the duty to provide information needed by the bargaining representative to assess claims made by

the employer relevant to contract negotiations.  The ALJ also held that Newcor violated the Act by unilaterally implementing its final proposal without bargaining to impasse.  First, the ALJ held that the evidence showed that the Union was willing to continue negotiations when Newcor declared the parties at an impasse and implemented Newcor's final proposal.  Alternatively, ALJ held that a valid impasse was not reached because Newcor failed to provide the census information requested by the Union and to which the Union was entitled.

The NLRB affirmed the ALJ's rulings, findings, and conclusions, and adopted the ALJ's order.   One member of the Board did not rely on the ALJ's rationale that Newcor's failure to provide the census data prevented a valid impasse.

On March 3, 2006, the Board filed its application for enforcement of its order.

## II. Analysis

### A. Standard of Review

This court reviews the NLRB's conclusions of law de novo.  *Pleasantview Nursing Home, Inc. v. NLRB*, 351 F.3d 747, 752 (6th Cir. 2003).  The NLRB's findings of fact must be upheld if supported by substantial evidence on the record considered as a whole.  *W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 870 (6th Cir. 1995) (citing 29 U.S.C. §§ 160(e), (f) and *Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)).  "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision."  *Turnbull Cone Banking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985).

The court must accept the Board's credibility findings unless they have no rational basis. *Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 967 (6th Cir. 2003).

### B. The Parties Did Not Reach a Valid Impasse

Substantial evidence supports the conclusions that the parties had not bargained to impasse and that Newcor's unilateral implementation of its final proposal was in violation of the Act. A valid impasse exists when "the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless." *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 543 n.5 (1988). The burden of establishing impasse is on the party asserting it. *Grinnell Fire Prot. Sys. Co. v. NLRB*, 236 F.3d 187, 196 (4th Cir. 2000) (citing *Tom Ryan Distributors, Inc.*, 314 N.L.R.B. 600, 604 (1994)). The Board's conclusion regarding impasse is entitled to deference. *NLRB v. H & H Pretzel Co.*, 831 F.2d 650, 656 (6th Cir. 1987) ("'[I]n the whole complex of industrial relations few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a board which deals constantly with such problems.'" (quoting *Am. Federation of Television and Radio Artists v. NLRB*, 395 F.2d 622, 627 (D.C. Cir. 1968))).

In *Taft Broadcasting Co.*, the NLRB listed a number of factors to be considered in determining whether negotiating parties have reached impasse, including "bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue

or issues as to which there is disagreement, [and] the contemporaneous understanding of the parties

as to the state of negotiations." *Taft Broadcasting Co.*, 163 N.L.R.B. 475, 478 (1967), *aff'd sub*

*nom. Am. Federation of Television and Radio Artists v. NLRB*, 395 F.2d 622 (D.C. Cir. 1968).

Substantial evidence supports the Board's conclusion that no valid impasse existed. The ALJ

concluded that Newcor's declaration of impasse was motivated by a June 10 deadline that Nicoson

repeatedly stated was in place. Although Nicoson attempted to explain the June 10 deadline by

asserting that customers would not want to do business with Newcor if they found out that Newcor

was operating without CBA, the ALJ noted that nothing in the record supported Nicoson's

contention and that the decision to declare impasse assured the result that Newcor was attempting

to avoid—operating in the absence of a negotiated agreement. The conclusion is supported by the

record. Nicoson was adamant about the June 10 deadline despite the fact that the Union's June 7

proposal reflected substantial movement on important issues, even if the movement was not to the

point that Newcor wanted. *See, e.g.*, *Dust-Tex Services, Inc.*, 214 N.L.R.B. 398, 405 (1974)

("Matthey's pronouncement . . . that the parties had reached an impasse was only a self-serving

statement artificially created and motivated by his desire to implement a change to the existing wage

structure immediately upon expiration of the contract."). Moreover, even if Newcor did bargain in

good faith, the other factors support the ALJ's conclusion that there was no impasse.

Although the there is no magic number in determining whether negotiations have continued

for a long enough period of time to support a finding of impasse, the length of negotiations is a

relevant consideration. The record supports the ALJ's conclusion that the length of negotiations was

not long enough to support a finding of impasse. First, the Union's revised proposal was not made until June 7, and Newcor declared an impasse on June 10. The Union's revised proposal went a long way toward meeting Newcor's demands for cuts and concessions. Although the record indicates that little headway was made at the June 9 meeting, the Union committee was still attempting to develop a proposal on June 10 when Nicoson ended negotiations and declared the parties at impasse. Newcor's position appears to be that, because the parties had been through seven meetings and had not come to an agreement, they had bargained long enough. However, Newcor was demanding drastic cuts and concessions and Wright admitted that Newcor's proposal was "ugly." Even assuming both parties would work diligently and in good faith, a potentially protracted negotiation should have been expected. Rather than counting the number of meetings and thus determining that the parties were at impasse, an examination of the conduct of the parties at those meetings is appropriate. On the facts presented, that there had been seven bargaining sessions does not lead to the conclusion that the parties had negotiated to impasse or that additional negotiations would have been futile, especially since the Union was continuing its efforts to develop a proposal to meet Newcor's concerns.

Finally, the question of the contemporaneous understanding of the parties supports the conclusion that the parties had not bargained to impasse. First, Ryan told Nicoson that the Union was willing to continue negotiating and the Union committee members testified that they did not consider the parties to be at impasse. This evidence supports the conclusion that the parties were not at impasse because the Union was willing to continue negotiations. *See, e.g., Teamsters Local Union*

*No. 639 v. NLRB*, 924 F.2d 1078, 1084 (D.C. Cir. 1991) ("These Union protestations manifest that one party did not view the negotiations as having reached impasse."); *Saunders House v. NLRB*, 719 F.2d 683, 688 (3d Cir. 1983) (impasse finding "often depends on the mental state of the parties"); *Huck Mfg. Co. v. NLRB*, 693 F.2d 1176, 1186 (5th Cir. 1982) (conclusion that there was no impasse was supported by the fact that the "Union's chief negotiator testified that he never felt the parties were at an impasse"). Although empty protestations will not preclude a finding of impasse, *H & H Pretzel*, 831 F.2d at 656, the disagreement expressed by the committee members in response to Nicoson's statement that the parties were at impasse supports the conclusion that the Union was willing to continue negotiating. Newcor argues that the information request made on June 10 contradicted the Union's statements that it was willing to continue negotiating because, according to the information request, it would be "difficult or even impossible for the union to put together a comprehensive proposal until we begin to receive information requests in a timely manner." However, the fact that the Union was telling Newcor that negotiating without relevant information was difficult does not negate the fact that the Union was willing to negotiate on other economic issues, even if the pension issue could not be settled that very day. The Union committee members expressly stated that they were willing to discuss anything. Newcor merely maintains that the parties remained far apart when impasse was declared. Remaining far apart on important issues where one party has expressed a willingness to bargain does not necessarily result in impasse. *See NLRB v. Webb Furniture Corp.*, 366 F.2d 314, 316 (4th Cir. 1966) ("When the union tendered some concessions, the employer might reasonably be required to recognize that negotiating sessions might produce other or more extended concessions.").

Overall, Newcor must establish that continued bargaining would have been futile. *Colfor Inc. v. NLRB*, 838 F.2d 164, 167 (6th Cir. 1988). As the ALJ noted, the parties had successfully narrowed the differences between them and were coming closer to an agreement when Nicoson pulled the plug on further negotiations. The Union presented a proposal that agreed to a number of concessions and significantly narrowed the differences between the parties' positions. Virtually all of the progress made during negotiations was a result of concessions from the Union. The conclusion that no impasse existed is supported by substantial evidence. We thus have no need to address the Board's alternative holding that impasse was impossible in light of Newcor's failure to provide the census data.

**B. Failure to Provide Census Information**

Newcor has only briefly and in summary fashion addressed the Board's determination that Newcor's failure to provide the requested census data was itself a violation of the Act. "[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) (citation and quotation marks omitted). Furthermore, "[a]n employer's 'failure to address or take issue with the Board's findings and conclusions with regard to . . . violations [of the Act] effectively results in abandonment of the right to object to those determinations.'" *NLRB v. Talsol Corp.*, 155 F.3d 785, 793 (6th Cir. 1998) (quoting *NLRB v. Ky. May Coal Co., Inc.*, 89 F.3d 1235, 1241 (6th Cir. 1996). In cases where the employer does not challenge the NLRB's findings on appeal, the court may "summarily enforce the Board's order with regard to those issues." *Id.* Thus,

we grant enforcement of the Board's order as it relates to Newcor's failure to provide the census

data.

### III. Conclusion

For the foregoing reasons, we grant enforcement of the Board's order.