RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

RIETH-RILEY CONSTRUCTION CO., INC.,
          *Petitioner/Cross-Respondent*,

          *v*.

NATIONAL LABOR RELATIONS BOARD,
          *Respondent/Cross-Petitioner*.

Nos. 23-1899/1946

───────────────

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.
Nos. 07-CA-261954; 07-CA-269365; 07-CB-247398.

Argued:  July 25, 2024

Decided and Filed:  August 14, 2024

Before:  MOORE, COLE, and MATHIS, Circuit Judges.

───────────────

## COUNSEL

───────────────

**ARGUED:**  Brian J. Paul, FAEGRE DRINKER BIDDLE & REATH, LLP, Indianapolis, Indiana, for Petitioner/Cross-Respondent.  Kellie J. Isbell, Benjamin M. Shultz, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.  **ON BRIEF:**  Brian J. Paul, Stuart R. Buttrick, Ryan J. Funk, Alexander E. Preller, FAEGRE DRINKER BIDDLE & REATH, LLP, Indianapolis, Indiana, for Petitioner/Cross-Respondent. Kellie J. Isbell, Benjamin M. Shultz, Ruth E. Burdick, Elizabeth A. Heaney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent/Cross-Petitioner.

───────────────

## OPINION

───────────────

COLE, Circuit Judge.  This action concerns an unfair labor practice dispute between Rieth-Riley Construction Co., a highway construction contractor in Michigan, and Local 324,

International Union of Operating Engineers, AFL-CIO (the Union), which represents employees at road construction contractors, regarding subcontracting and employee wages. This matter comes before us on Rieth-Riley's Petition for Review and the Board's Cross-Application for Enforcement of a Final Order of the Board. We enforce the NLRB's decision and order, hold that the President can remove the NLRB General Counsel at will, and hold that the General Counsel had unreviewable prosecutorial discretion to fashion complaints on behalf of the parties.

I.

A.

Rieth-Riley is an asphalt paving and heavy road construction contractor in Michigan. The Union represents more than 14,000 employees of road construction contractors in Michigan, including Rieth-Riley. The last collective-bargaining agreement between Rieth-Riley and the Union expired on May 31, 2018 (the Road Agreement). Negotiations began in November 2018, but despite participating in 10 bargaining sessions between then and September 2019, the parties have not yet reached a successor agreement.

The two main issues remaining after the parties' negotiations are subcontracting and wages. On July 8, 2019, the Union proposed requiring Rieth-Riley to subcontract only with subcontractors who comply with the terms of the prior Road Agreement. Rieth-Riley counter-proposed on July 29, stating that it would agree to the Union's restrictions if they were limited to seven counties. The Union rejected the counter-proposal because it had a successor contract with the Michigan Union Contractors Group (MUCG) that contained a "most-favored-nations" clause, under which any agreement with Rieth-Riley to limit the subcontracting restriction to certain counties would impact the Union's other subcontracting agreements throughout the state.

During one of the negotiating sessions, Doug Stockwell, the Union's business manager, told Keith Rose, Rieth-Riley's President and CEO, that the Union "might as well die on the vine" if it did not get "its desired subcontracting language" and that he was "willing to burn the house down over subcontracting." (ALJ Op., PageID 2143.) On July 31, 2019, while contract negotiations were ongoing, the Union went on strike against Rieth-Riley. The Union then set up picket lines at 13 Rieth-Riley facilities in Michigan.

Relevant here, on August 13, 2019, at the Rieth-Riley Lansing facility, truckdrivers Karl Grinstern and Chad Feibig were driving out of the facility at three to four miles per hour when the truck hit the left side of the body of Michael Feighner, a striking union member picketing on the driveway.  Feighner then yelled at Grinstern, jabbed Grinstern's arm with a picket sign several times, opened the truck door, took the keys out of the ignition, and spit in Grinstern's face.  Union representative Robert Heurtebise stepped between the men and suggested Feighner leave for the day.  Feighner was not disciplined and was paid by the Union for picketing.  On August 29, 2019, Rieth-Riley filed an unfair labor practice charge against the Union regarding the Feighner and Grinstern incident as well as other alleged picket line misconduct.

On June 1, 2020, the Union requested the following subcontractor-related information:

> For the last four years, provide any and all documents that indicate the percentage of work covered by the expired 2013–2018 MITA/IUOE 324 Road Agreement that has been subcontracted.

(*Id.* at PageID 2143.)  The Union explained that the information was relevant to its bargaining responsibility and that whether "Rieth-Riley sub-contracts one to ten percent of its work versus . . . 50 percent or more would have a large impact" on its counter-proposals.  (*Id.* at 2144.)

On June 16, 2020, Rieth-Riley responded, stating: (1) this was the third iteration of the same request; (2) the information requested was not relevant to negotiations, was confidential, and akin to a trade secret; (3) the request was just pretense for the Union to bring an unfair labor practice charge; and (4) the Union would use the information to harass the subcontractors.  On June 18, 2020, the Union filed an unfair labor practice charge against Rieth-Riley for its refusal to provide the requested subcontracting information.

On November 3, 2020, the Union sent a second request, about bargaining unit employees:

> From June 1, 2020, to the present, provide the compensation, both wages and fringe benefits, for all employees (including their names and classifications) doing work covered by the work jurisdiction provisions of the expired 2013-2018 MITA/IUOE 324 Road Agreement.  This information demand includes, but is not limited to, all employees on whose behalf Rieth-Riley has ever previously paid employee benefit contributions to the Operating Engineers Local 324 Fringe Benefit Funds.

(*Id.* at PageID 2146.)  On November 12, 2020, Rieth-Riley responded, stating that: (1) the term "work jurisdiction provisions" was vague; (2) the Union requested this information to harass Rieth-Riley employees; and (3) no bargaining sessions had occurred for a year.  (*Id.* at PageID 2147.)  Rieth-Riley proposed a definition for "work jurisdiction provisions" based on Article I of the preexisting Road Agreement and requested confirmation from the Union.

On November 16, 2020, the Union confirmed that the Road Agreement provision cited by Rieth-Riley defined "work jurisdiction provisions" but "not by limitation." (*Id.*)  Rieth-Riley responded on November 20, stating it understood the Union's response to reject the proposed definition of "work jurisdiction provisions" without offering an alternative definition, and requested the term be defined with specificity.  On November 23, 2020, the Union filed an unfair labor practice charge against Rieth-Riley for failure to provide the bargaining unit employee information.

B.

On July 30, 2020, the General Counsel of the NLRB issued a complaint on behalf of Rieth-Riley containing 10 allegations against the Union for alleged picketing misconduct in violation of Section 8(b)(1)(A) of the NLRA.  On September 24, 2020, the General Counsel issued a complaint on behalf of the Union against Rieth-Riley for failure to produce the requested subcontracting percentage information.  On February 5, 2021, the General Counsel issued a second complaint on behalf of the Union against Rieth-Riley for failure to produce the November 2020 requested bargaining unit employee information.  All three cases were consolidated for hearing.  On March 3, 2021, the General Counsel withdrew nine of the picketing misconduct allegations against the Union, leaving only the incident between Feighner and Grinstern.

At the hearing, in addition to testimony about the incident between Grinstern and Feighner, Rieth-Riley presented evidence of other picket line misconduct, which the ALJ allowed for the limited purpose of arguing as a defense that Rieth-Riley had reasonable fear that the Union would use the information requested improperly.  Rieth-Riley alleged that the picketers engaged in misconduct at 10 facilities, including picketers: blocking the vision of

drivers with their picket signs and stopping vehicles attempting to exit the facilities, throwing "fart bombs" into the vehicles of non-picketing employees, breaking the windshields of Rieth-Riley vehicles and machinery, making contact with trucks trying to leave the facility, shouting at non-striking employee drivers, and using their own vehicles to block the entrances and exits to certain facilities.

On July 18, 2022, the ALJ issued a decision concluding that Rieth-Riley's refusals to provide information were not justified and violated NLRA Section 8(a)(1) and (5), and that the Union violated Section 8(b)(1)(A) when Feighner struck Grinstern with a picket sign and spit in his face. Because it was not alleged in the complaint, the ALJ declined to make a finding as to whether Feighner's spitting on Feibig, the other truckdriver in the vehicle with Grinstern, was a violation of Section 8(b)(1)(A). The ALJ ordered: (1) Rieth-Riley to provide the subcontracting and employee information to the Union; and (2) the Union to cease and desist from physically assaulting individuals by hitting or spitting on them, and from restraining or coercing employees in their exercise of their NLRA rights.

On September 28, 2023, the Board affirmed the ALJ's Decision and adopted the ALJ's Order with a slight modification requiring the subcontracting information be limited to documents indicating the overall percentage of subcontracting. Rieth-Riley now petitions this court, requesting review of the Board's Order and that we remand the matter for further proceedings. The NLRB cross petitions for enforcement of its order.

## II.

This court defers to the "Board's findings of fact, reasonable inferences from the facts, and applications of law to the facts if they are supported by substantial evidence on the record considered as a whole." *Hendrickson USA, LLC. v. NLRB*, 932 F.3d 465, 469 (6th Cir. 2019). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

We do not defer to the NLRB's interpretation of the NLRA, but exercise independent judgment in deciding whether an agency acted within its statutory authority. *Loper Bright*

*Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024). We pay "careful attention" to the judgment of the agency to inform that inquiry, *id.* at 2273, and we also review de novo the NLRB's interpretation of non-NLRA legal conclusions, *Painting Co. v. NLRB*, 298 F.3d 492, 499 (6th Cir. 2002). Finally, the Board has "broad discretion in fashioning remedies for [NLRA] violations." *NLRB v. ADT Sec. Servs., Inc.*, 689 F.3d 628, 635 (6th Cir. 2012). We review remedial orders for abuse of discretion. *Compuware Corp. v. NLRB*, 134 F.3d 1285, 1291 (6th Cir. 1998).

III.

A.

In January 2021, President Joseph R. Biden removed the NLRB's then General Counsel, Peter Robb, who had 10 months remaining on his four-year term. President Biden named Peter Ohr as the Acting General Counsel, after which Ohr issued the unfair-labor practice complaints against Rieth-Riley. Rieth-Riley argued that President Biden's removal of then-General Counsel Robb was invalid, rendering the unfair labor practice complaints against it invalid. The Board concluded there was no legal basis for a challenge to the President's removal authority over the General Counsel. (Board Decision & Ord. at PageID 2476 n.1 (citing *Aakash Inc. d/b/a Park Cent. Care & Rehab. Ctr.*, 371 NLRB No. 46, slip op. at 1 (2021) *enfd. NLRB v. Aakash, Inc.*, 58 F.4th 1099, 1103–05 (9th Cir 2023)).

The Constitution gives the President authority "to remove those who assist him in carrying out his duties." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 513–14 (2010). The President's removal power of an executive officer is generally plenary. *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 214–15 (2020). The Supreme Court recognizes two exceptions to the President's plenary removal power, neither of which are applicable here.

First, Congress can impose removal restrictions on a multi-member body of experts with staggered terms that is politically balanced, does not exercise executive power, and performs quasi-legislative and quasi-judicial functions. *Id.* at 216–17; *Humphrey's Executor v. United States*, 295 U.S. 602, 624, 628 (1935) (upholding removal protections for commissioners of the

Federal Trade Commission because they had no executive power and it was an administrative body that performed specified legislative or judicial duties); *Wiener v. United States*, 357 U.S. 349, 356 (1958) (upholding removal protections for members of the War Claims Commission—an independent, three-member body that adjudicated WWII injury claims).

Second, Congress can compel for-cause removal protections for inferior officers who have limited duties and no policymaking or administrative authority that could "impede the President's ability to perform his constitutional duty." *Morrison v. Olson*, 487 U.S. 654, 691 (1988) (upholding removal protections for an independent counsel appointed to investigate and prosecute crimes by high-ranking Government officials); *see also United States v. Perkins*, 116 U.S. 483, 485 (1886) (upholding tenure protections for a naval cadet-engineer).

Neither exception applies because the General Counsel is a singular officer that exercises extensive executive functions. The General Counsel has final authority to: (1) supervise all NLRB attorneys (other than ALJs and legal assistants to Board members); and (2) investigate charges, issue complaints, and prosecute unfair labor practices. 29 U.S.C. § 153(d); *see also Seila L. LLC*, 591 U.S. at 218–19 (declining to extend removal protections to CFPB director because the director was not merely a legislative or judicial aid, but administered 19 consumer-protection statutes, promulgated rules, issued "final decisions awarding legal and equitable relief in administrative adjudications," and was empowered to "seek daunting monetary penalties against private parties on behalf of the [U.S.] in federal court"); *and Collins v. Yellen*, 594 U.S. 220, 250–51 (2021) (holding as unconstitutional statutory restrictions on President's removal authority of director of FHFA).

Further, the "words, structure, and history of the . . . NLRA clearly reveal that Congress intended to differentiate between the General Counsel's and the Board's 'final authority' along a prosecutorial versus adjudicatory line." *NLRB v. United Food & Commercial Workers Union, Local 23* (*UFCW*), 484 U.S. 112, 124 (1987) (quoting 29 U.S.C. § 153(d)). In response to complaints of bias and lack of uniformity in enforcement, the 1947 Taft-Hartley Act amendment to the NLRA created the General Counsel's office to separate the Board from the prosecutorial functions of the office. *Jackman v. NLRB*, 784 F.2d 759, 763 (6th Cir. 1986); *see also UFCW*, 484 U.S. at 129 (explaining that the "on behalf of the Board" language in 29 U.S.C. § 153(d) was

added "to make it clear that the General Counsel acted within the agency, not to imply that the acts of the General Counsel would be considered acts of the Board"). The decision to initiate or dismiss charges is an executive, not judicial, constitutional duty. *United States v. Bell*, 37 F.4th 1190, 1195–96 (6th Cir. 2022).

The text of the NLRA also supports this conclusion. "When a statute does not limit the President's power to remove an agency head, [courts] generally presume that the officer serves at the President's pleasure." *Collins*, 594 U.S. at 248. Section 3(d) provides that the Board's General Counsel "shall be appointed by the President, by and with the advice and consent of the Senate, for a term of four years." 29 U.S.C. § 153(d). It contains no provision restricting the President's removal power, unlike Section 3(a), which expressly states: "[a]ny member of the Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for *no other cause*." 29 U.S.C. § 153(a) (emphasis added). "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Collins*, 594 U.S. at 248 (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)). Further, the General Counsel's fixed, four-year term does not implicitly provide removal protections. The Supreme Court has long held that a fixed term of office, without any additional limitation, does not impact the President's discretionary removal power. *Parsons v. United States*, 167 U.S. 324, 338–39 (1897).

Rieth-Riley differentiates between the General Counsel's prosecutorial function in front of the Board and his responsibility to the Board to petition courts of appeals for enforcement of Board decisions through litigation. *See* 29 U.S.C. § 160(e) ("The Board shall have power to petition any court of appeals of the United States . . . for the enforcement" of its decisions and orders). Rieth-Riley argues that the NLRB must rely on the General Counsel to effectuate its decisions by seeking enforcement, because the Board's independence is tied to the that of the General Counsel. Without removal protections, Rieth-Riley maintains that the General Counsel can undermine the Board's actions and be put in the impossible position of serving "two masters" with "conflicting agendas," i.e., the President and the Board. (Pet'r's Br. 59.)

First, it is the General Counsel's prosecutorial function in front of the Board—an authority built into the statutory framework to which no party objects—that provides the General Counsel with influence over the issues that the Board may ultimately petition federal courts to review. The General Counsel has final authority to issue, and withdraw, complaints. 29 U.S.C. § 153(d). Thanks to that prosecutorial authority, the General Counsel determines what charges the Board will hear and thus what issues the Board will have an opportunity to decide and seek enforcement of. The authority to initiate or dismiss complaints is a purely executive, not judicial, function, *Bell*, 37 F.4th at 1195–96; it is squarely on the prosecutorial side of the "prosecutorial versus adjudicatory line," *UFCW*, 484 U.S. at 124. Stated otherwise, it is prosecutorial, i.e., executive authority to bring and drop charges that empowers the General Counsel; the President properly has removal authority over officers with such executive function. *See Collins*, 594 U.S. at 250–52. The General Counsel's purely executive function, moreover, is detached from the Board's adjudicatory function and thus untethered from the Board's independence.

Second, removal protections would serve only to insulate the General Counsel's office from accountability by removing the President's at-will removal power, which is currently the main check on the General Counsel's actions. *See id.* at 252. As explained above, the General Counsel's and the Board's authority are separated "along a prosecutorial versus adjudicatory line." *UFCW*, 484 U.S. at 124. Removal protections for the General Counsel thus would not provide the Board with more control over the office than it already has.

In sum, President Biden lawfully removed former General Counsel Robb, and the prosecution brought by then-Acting General Counsel Ohr against Rieth-Riley was proper. *See Aakash, Inc.*, 58 F.4th at 1104–06 (holding the President has at-will removal power over NLRB General Counsel); *Exela Enter. Sols., Inc. v. NLRB*, 32 F.4th 436, 443–45 (5th Cir. 2022) (same).

B.

"Section 7 of the NLRA guarantees employees the right 'to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing,' and the right to refrain from those activities." *Hendrickson USA, LLC.*, 932 F.3d at

470 (quoting 29 U.S.C. § 157). Section 8 makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7]," including refusing to bargain collectively in good faith with the representatives of an employer's employees. 29 U.S.C. § 158(a)(1), (a)(5). An employer's duty to bargain collectively includes providing, on request, "relevant information needed by a labor union for the proper performance of its duties as the employees' bargaining representative." *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303 (1979). "Good faith bargaining requires full disclosure by the parties of relevant information in order to produce informed, effective negotiations." *NLRB v. Goodyear Aerospace Corp.*, 497 F.2d 747, 751 (6th Cir. 1974) (quotations and citation omitted). "The duty to supply information under § 8(a)(5) turns upon 'the circumstances of the particular case.'" *Detroit Edison Co.*, 440 U.S. at 314 (quoting *NLRB v. Truitt Mfg. Co.*, 351 U.S. 149, 153 (1956)).

We apply a liberal "discovery type standard," which requires only that the requested information be relevant to the union in its negotiations and helpful in carrying out its responsibilities. *Gen. Motors Corp. v. NLRB*, 700 F.2d 1083, 1088 (6th Cir. 1983). "Relevance is broadly construed, and in the absence of a countervailing interest, any requested information that has a bearing on the bargaining process must be disclosed." *U.S. Testing Co. v. NLRB*, 160 F.3d 14, 19 (D.C. Cir. 1998) (citation omitted).

*Bargaining Unit Employee Information.* The NLRA "creates a duty to bargain collectively 'with respect to wages, hours, and other terms and *conditions of employment*.'" *Gen. Motors Corp.*, 700 F.2d at 1088 (quoting 29 U.S.C. § 158(d)). Bargaining unit employees' wages, hours, and conditions of employment are "presumptively relevant to bargaining issues" and an "employer has a duty to provide such information on request." *Goodyear Aerospace Corp.*, 497 F.2d at 751 (citation omitted).

The bargaining unit employee information that the Union requested is relevant in two ways. First, it is presumptively relevant on its face as wage-related information. Second, it is specifically relevant to the parties' negotiations, because wages are an outstanding issue. Substantial evidence supports the finding that Rieth-Riley should have understood why the Union requested this information and that it was obligated to provide the Union with this

"readily available relevant information."  *ASARCO, Inc., Tenn. Mines Div. v. NLRB*, 805 F.2d 194, 198 (6th Cir. 1986).

Rieth-Riley's allegations of bad faith do not alleviate its burden, as the "good faith" disclosure requirement is met if "at least one reason for the demand can be justified."  *Country Ford Trucks, Inc. v. NLRB*, 229 F.3d 1184, 1192 (D.C. Cir. 2000) (citing *Island Creek Coal Co.*, 292 NLRB 480, 489 (1989)).  The Union's demand was justified by its role as the employee's bargaining representative.  The requested names, compensation, and classification information was presumptively relevant, and the Union was not required to provide further justification.

Rieth-Riley argues, however, that it was unable to comply because the Union's information request was ambiguous.  This argument is without merit.  In *Keauhou Beach Hotel*, the Board established the standard that "an employer may not simply refuse to comply with an ambiguous and/or overbroad information request, but must request clarification *and/or* comply with the request to the extent it encompasses necessary and relevant information."  298 NLRB 702, 702 (1990) (emphasis added).  Rieth-Riley contends that the Board modified this same standard four years later by eliminating the conjunctive "and/or," and instead adopting the disjunctive "or"; specifically, in *Pacific Physicians Servs., Inc*., the Board explained that "[i]t is well established that an employer may not simply refuse to comply with an ambiguous or overbroad information request, but must request clarification *or* comply with the request to the extent it encompasses necessary and relevant information."  315 NLRB 108, 108 (1994) (emphasis added).  Given this language, in Rieth-Riley's view, it met its obligation by requesting clarification, and it was not required to act further when the Union allegedly failed to clarify the definition of part of its request.

It is true that the Board has inconsistently applied this standard.  Indeed, more recent decisions addressing information request disputes apply both the "and/or" standard established in *Keauhou Beach Hotel* and the "or" disjunctive standard.  *See e.g., Starbucks Corp. & Workers United, a/w Serv. Emps. Int'l Union*, 373 NLRB No. 48, 2024 WL 1961075, *2 (May 2, 2024) (applying "and/or" standard); *Superior Protection Inc.*, 341 NLRB 267, 269 (2004) (applying "or" standard).  Which standard is applicable, however, is irrelevant because negotiations did not end after Rieth-Riley sought clarification.

There is substantial evidence that the Union appropriately clarified that "work jurisdiction provisions" was defined, at a minimum, by Article I of the Road Agreement.  At that point, Rieth-Riley was obligated to move onto step two and provide the presumptively relevant employee information the Union indicated it needed to make wage proposals.[1]  *See Hilton Hotel Employer LLC*, 372 NLRB No. 61, at *5 (Feb. 28, 2023) (concluding the hotel employer had conducted "semantic gamesmanship" when it refused to provide the union with the requested information, even after the union clarified because the totality of the circumstances showed that the union sought guest feedback information).  Further, Rieth-Riley's position acts against the purpose of Section 8(a)(5), which encourages good faith bargaining and sharing of information. *Goodyear Aerospace Corp.*, 497 F.2d at 751.

In conclusion, there is substantial evidence that the bargaining unit employee information was presumptively relevant and was going to be used by the Union to draft a wage proposal. Once the Union clarified that Article I of the Road Agreement provided the basic definition for "work jurisdiction provisions," Rieth-Riley was, at minimum, obligated to provide the presumptively relevant information to the Union within the boundaries of that definition.

*Subcontracting Percentage Information*.  Where the information requested concerns non-unit employees, like requests for subcontracting information, the Union must establish relevancy. *E.I. DuPont de Nemours & Co. v. NLRB*, 744 F.2d 536, 538 (6th Cir. 1984) (per curiam). Because subcontracting was at issue in the negotiations, information about subcontracting is relevant to the Union's ability to fulfill its duties as the collective-bargaining representative for union employees. *Cf. Elec. Workers Loc. 58 Pension Tr. Fund v. Gary's Elec. Serv. Co.*, 227 F.3d 646, 654 (6th Cir. 2000) (explaining that a union's request for information about enforcement of an existing agreement with an employer was relevant to the union's ability to

---

[1]While the strike was ongoing, there were two petitions filed for an election to decertify the Union as the bargaining representative of Rieth-Riley's operating engineers in Michigan.  Both were dismissed by the General Counsel.  In response to the second petition, Rieth-Riley provided the Union with a voter list containing the full names, work locations, shifts, job classifications, contact information, and job category of all eligible voters (i.e., whether the employee had returned to work from striking, was a striker, or was a replacement worker).  That the Union already had access to most of the bargaining unit employee information from a prior decertification petition does not discharge Rieth-Riley's obligation. *ASARCO, Inc.*, 805 F.2d at 198 (explaining that "the availability of the requested information from another source does not alter the employer's duty to provide readily available relevant information" to the union).

fulfill its duties); *Crozer-Chester Med. Ctr v. NLRB*, 976 F.3d 276, 285–86 (3d Cir. 2020) (finding that information in an employer's asset purchase agreement for sale of employer's health care network contained relevant information regarding availability of work, potential for layoffs and hiring, and whether non-unit employees were receiving pay and benefits the union may want to negotiate for union employees). Not only was the information directly relevant to the Union's potential subcontracting counterproposals, but the Union explained that a smaller percentage of subcontracting would have less impact on its subcontracting proposal than a larger percentage.

Rieth-Riley argues that negotiations were at an impasse because the parties had rejected each other's proposals and had not held a negotiating session since September 2019. But "a true impasse" exists "after good-faith negotiations have exhausted the prospects of concluding an agreement." *Taylor v. ADT, LLC*, No. 22-6116, 2023 WL 6601885, at *4 (6th Cir. Oct. 10, 2023) (quoting *United Paperworkers Int'l Union v. NLRB*, 981 F.2d 861, 866 (6th Cir. 1992) (per curiam)). And here, the record evidence does not "*conclusively* point[] to an exhaustion of good faith negotiations." *Id.* at *5. That there had been 10 negotiating sessions without an agreement is not conclusive as to whether negotiations had stalled. *NLRB v. Newcor Bay City Div. of Newcor, Inc.*, 219 F. App'x 390, 396 (6th Cir. 2007) (finding no impasse where seven bargaining sessions had occurred, and the union was developing a proposal to meet employer concerns).

In fact, the Union's request for information demonstrated its continuing efforts to develop a subcontracting proposal. *See Kreisberg v. HealthBridge Mgmt., LLC*, 732 F.3d 131, 142 (2d Cir. 2013) (finding no impasse where "the Union was signaling a willingness to make concessions" or "compromise"). Further, the Union indicated in its letter that subcontracting would be much less of an issue if it comprised only 10% of Rieth-Riley's work. This demonstrates that the Union thought an agreement was potentially reachable—not that the parties were deadlocked. This is also evidence that the Union had potentially departed from its position that the Union would "die on the vine" when it came to subcontracting. Finally, even if we assumed the parties were at a negotiation impasse, Rieth-Riley's failure to provide the information would not help to break the impasse; in fact, it would prolong it. That behavior

should not be rewarded.  Given the above, substantial evidence supported the ALJ's conclusion that the negotiations were on hiatus, not at an impasse.

Rieth-Riley also argues that the subcontracting information is confidential.  A union's interest in relevant information must accommodate privacy concerns.  *Detroit Edison Co.*, 440 U.S. at 318–20 (holding that a union's request for employee aptitude tests was relevant to its claim, but employer's interest in preserving confidentiality was also legitimate, and disclosing the information only upon the employee's written consent was a reasonable accommodation). Employers, however, must propose a way to release the information that accommodates its concerns, such as placing restrictions on the use of the information while still meeting its bargaining obligations.  *See, e.g., E. Tenn. Baptist Hosp. v. NLRB,* 6 F.3d 1139, 1144 (6th Cir. 1993) (reversing Board decision where hospital employer offered reasonable alternatives to union request for wage and attendance information that protected the confidentiality of non-union employees).  The onus is placed on the employer because it can propose "how best [to] respond to a union['s] [information] request."  *U.S. Testing Co.*, 160 F.3d at 21.

As the ALJ explained, redacting the subcontractors' names and addresses was one way to address Rieth-Riley's concerns, but Rieth-Riley never proposed that as a reasonable accommodation.  Nor did it ask the Union to keep the information confidential.  Therefore, substantial evidence supports the conclusion the Rieth-Riley failed to meet its burden in asserting this defense and that the NLRA compelled disclosure of this information.

C.

The original complaint issued on behalf of Rieth-Riley against the Union by the General Counsel on July 30, 2020, alleged 10 instances of picket line misconduct, pursuant to Section 8(b)(1)(A) of the NLRA.  On March 3, 2021, the General Counsel withdrew nine of the allegations, leaving only the allegations concerning the incident between Feighner and Grinstern. Then-Acting General Counsel Ohr denied Rieth-Riley's appeal of the withdrawal of the misconduct allegations.[2]

---

[2]On May 14, 2021, Rieth-Riley filed a complaint for declaratory judgment in the United States District Court for the Western District of Michigan, alleging the withdrawal of the nine allegations was invalid because:

The Board affirmed the ALJ's conclusion that Feighner's assault on Grinstern was an unfair labor practice because a union may not restrain or coerce employees in the exercise of their rights. *See* 29 U.S.C. § 158(b)(1)(A). The Board also concluded that the ALJ need not find a separate violation occurred when Feighner spit on another driver because the remedial notice to the Union already banned spitting. Finally, the Board concluded that the ALJ did not err by not ruling on allegations of picket line misconduct that were not included in the complaint.

On appeal, Rieth-Riley challenges the Board's decision not to reach 42 of the 44 picket misconduct allegations raised at the hearing. Rieth-Riley also argues the Board erred when it concluded that it need not find additional violations because the remedial notice regarding the assault violation was sufficient to apprise picketers of their other unlawful conduct based on the limited allegations in the complaint.

The General Counsel has "final authority" regarding the filing, investigation, and prosecution of unfair labor practice complaints. 29 U.S.C. § 153(d). Therefore, "Congress has delegated to the Office of the General Counsel 'on behalf of the Board' the unreviewable authority to determine whether a complaint shall be filed." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138 (1975); *McGlone v. Cintas Corp.*, 35 F.3d 566, *4 (6th Cir. 1994) (table) (citation omitted) (explaining a "General Counsel's refusal to issue a complaint is within his prosecutorial discretion and the courts are without jurisdiction to review that discretionary act"). The General Counsel also has the discretion to withdraw a complaint. *UFCW*, 484 U.S. at 126. While final orders of the Board are judicially reviewable under Section 10(f) of the NLRA, the statute provides for no such review of General Counsel decisions. 29 U.S.C. § 160(f); *cf. UFCW*, 484 U.S. at 130 (explaining that "since respondent concedes that the General Counsel's decision not to file a complaint is not reviewable under § 10(f), we perceive no merit or logic in the argument that a settlement decision of the General Counsel may be"). Because the decision not to

---

(1) it violated the Board's rules on appeals to the General Counsel; and (2) Ohr was not a valid Acting General Counsel because General Counsel Robb's firing was unlawful. On June 21, 2024, the district court granted the General Counsel's motion to dismiss the complaint, finding it lacked subject-matter jurisdiction because the General Counsel's decision to withdraw portions of the complaint "unquestionably constitute[d] an exercise of prosecutorial discretion that Congress shielded from judicial review." *Rieth-Riley Construction Co. v. Kerwin et al.*, R. 26, No. 1:21-cv-407, at 12 (W.D. Mich. June 21, 2024).

prosecute certain allegations was within the General Counsel's prosecutorial discretion, it cannot be reviewed by this court under the NLRA.

Rieth-Riley's other picket line misconduct allegations were not fully litigated before the ALJ, and those claims are therefore not reviewable by the Board and this court. Whether an issue has been fully litigated is best illustrated in the preclusion context. "An administrative board acts in a judicial capacity when it hears evidence, gives the parties an opportunity to brief and argue their versions of the facts, and the parties are given an opportunity to seek court review of any adverse findings." *Herrera v. Churchill McGee, LLC*, 680 F.3d 539, 547 (6th Cir. 2012) (quoting *Nelson v. Jefferson County*, 863 F.2d 18, 19 (6th Cir. 1988)). In *Herrera*, we gave preclusive effect to a county administrative decision in the later federal court proceedings because the plaintiff was given a full and fair opportunity to litigate his claim through prior administrative proceedings by presenting evidence and seeking judicial review of the administrative decision. *Id.* at 547–50.

While Rieth-Riley presented evidence of other misconduct violations, the ALJ concluded most of that evidence was hearsay, and allowed it only as evidence of state-of-mind under Federal Rule of Evidence 803(3). Further, the ALJ unequivocally stated that those other incidents of misconduct were not alleged in the complaint, and the evidence was not presented for the truth of the matter asserted, but instead to support Rieth-Riley's affirmative defense that the Union would use the requested employee and subcontracting information improperly. Also, the Union and General Counsel did not present rebuttal evidence.

"Evidence without a supporting allegation cannot serve as the basis of a determination of an unfair labor practice." *Montgomery Ward & Co. v. NLRB*, 385 F.2d 760, 763 (8th Cir. 1967). Typically, "[t]he Board may not make findings or order remedies on violations not charged in the General Counsel's complaint or litigated in the subsequent hearing" and "[e]ven where the record contains evidence supporting a remedial order, the court will not grant enforcement in the absence of either a supporting allegation in the complaint or a meaningful opportunity to litigate the underlying issue in the hearing itself." *NLRB v. Blake Constr. Co.,* 663 F.2d 272, 279 (D.C. Cir. 1981). This approach is in line with due process expectations and avoids forcing this court to make decisions on an incomplete record. *Contra Action Auto Stores Inc.,* 298 NLRB 875, 876

n.2 (1990), *enfd.* 951 F.2d 349 (6th Cir. 1991) (table) (per curiam) ("It is well established that the Board may find a violation not alleged in the complaint if the matter is related to other violations alleged in the complaint, is *fully and fairly litigated*, and no prejudice to the respondent has been alleged or established.") (emphasis added). Given the limited purpose of the evidence presented and that the misconduct was not alleged in the complaint, we cannot fairly conclude that both parties were provided with "an opportunity to brief and argue their versions of the facts." *Herrera*, 680 F.3d at 547.

Finally, the ALJ's notice remedy, as affirmed by the Board, was sufficient to apprise the Union of the unlawful conduct alleged in the complaint. At the time of the hearing, the only remaining allegation in the complaint was that Feighner "inflicted injury upon [Grinstern] by striking [him] with a picket sign." (Misconduct Compl., Admin R., PageID 1756.) Again, this court must defer to the General Counsel's prosecutorial discretion to pursue only one incident of misconduct. *See Sears, Roebuck & Co.*, 421 U.S. at 138. Although Rieth-Riley presented testimony that Feighner also blocked the facility driveway, damaged vehicles, and seized Grinstern's personal property, the ALJ was not tasked with making a finding as to those actions. The complaint was limited to Feighner striking Grinstern with a picket sign. Therefore, the notice sufficiently warned striking members that they could not "[p]hysically assault[] individuals, by hitting them with picket signs or spitting in their face" because it violated Section 8(b)(1)(A) of the NLRA. (Board Decision & Ord., PageID 2477.)

IV.

For the foregoing reasons, we **DENY** Rieth-Riley's petition for review and **GRANT** the NLRB's cross-application for enforcement of its order in full.